IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARK A. CAMPBELL A/K/A
NICOLE ROSE CAMPBELL,

        Plaintiff,

v.                         Case No. 16-CV-0261

KEVIN KALLAS, et al.,

        Defendants.

## DEFENDANTS' PROPOSED FINDINGS OF FACT

Defendants, by and through their attorneys, hereby submit the following proposed findings of fact.

## I. Wisconsin Department of Corrections' practices with regard to the diagnosis, policies, and decisions for care of transgender inmates.

### A. The role of DOC's Mental Health Director.

1.    From 2002 to the present, Dr. Kallas's role has been administrative: as the Mental Health Director for the Wisconsin Department of Corrections (DOC), Dr. Kallas does not provide direct care to inmates, but supervises (and consults with) clinicians that do. (Dkt. 56:20-21, 41.)

2. Dr. Kallas also develops and implements policies within the DOC for the treatment of psychiatric and psychological disorders, including transgender individuals. (Dkt. 56:20-21, 41.)

3. In addition to employing psychologists with experience treating transgender individuals within DOC, Dr. Kallas works with Cynthia Osborne as a gender dysphoria consultant. (Dkt. 56:38, 78, 83.)

4. If an inmate requests transgender services (such as hormone therapy or sex reassignment surgery), the inmate's primary care physician typically contacts Dr. Kallas. Dr. Kallas then seeks input from the inmate's treating psychologist before putting the inmate on a schedule to be evaluated by Cynthia Osborne. (Dkt. 56:69.)

**B. Gender dysphoria consultant Cynthia Osborne**

5. Osborne was initially hired in 2011 to give DOC opinions about the appropriateness of starting hormones for transgender inmates. Later, Osborne's role expanded to consult with DOC regarding inmates requesting sex reassignment surgery. (Dkt. 56:38, 78, 83.)

6. Osborne travels from her home state of Maryland to Wisconsin and spends a week at a time (every six to eight weeks or so) evaluating inmates that have been identified by Dr. Kallas as requesting transgender care. (Dkt. 56:121.)

7.     To assist in her review, Osborne is given access to each inmate's psychological records, psychiatric records, pre-sentence investigations, revocation summaries and incident reports.  (Dkt. 56:91-92.)

8.     Osborne then prepares a report on each individual inmate that Dr. Kallas then forwards to the inmate's staff psychologist.  (Dkt. 56:121.)

9.     If hormone therapy is recommended, Dr. Kallas puts the inmate on the list to be evaluated by Dr. Betsy Luxford for the initiation of hormone therapy. (Dkt. 56:122.)

10.     DOC holds monthly clinical conference calls for clinicians and psychologists that work in the prisons across the state to discuss cases with Cynthia Osborne. (Dkt. 56:38.)

11.     With respect to treating transgender inmates, DOC typically follows Osborne's recommendations. (Dkt. 56:94.)

**C.     The DOC policy relating to gender dysphoria.**

12.     Division of Adult Institution (DAI) Policy No. 500.700.27 is the DOC policy that applies to transgender individuals that are incarcerated within DOC.  (Dkt. 56:28.)

13.     DAI Policy No. 500.700.27 defines transgender as "A person whose transient or permanent gender identity (i.e. internal sense of feeling male or female) is different from the person's assigned sex at birth. A transgender individual may or may not qualify for a clinical diagnosis of Gender Dysphoria

depending on the level of distress or impairment this causes." (Dkt. 56:139, Dkt. 75-:9.)

14.     The newest version of DAI Policy No. 500.700.27 was implemented in November, 2017. There are two primary changes to the prior version of the policy. The first concerns the number of institutions that can house transgender inmates. The current policy expands the number of institutions that can house transgender individuals. The second change concerns property allowances.  The previous policy allowed only inmates that were diagnosed as transgender to obtain "transgender accommodations and property," including female undergarments.  The new policy allows inmates that self-identify as transgender to obtain the accommodations. (Dkt. 56:139, Dkt. 75:9.)

15.     With regard to medical and psychological treatment for inmates with gender dysphoria,  DAI Policy No. 500.700.27 states as follows:

> A. Not all transgender inmates will need medical or psychological care that pertains to gender issues. The inmates who require this care will generally have a clinical diagnosis of GD.
>
> B. Inmates diagnosed with GD shall have access to clinically appropriate treatment options that may include:
>
> > 1. Psychological treatment that addresses ambivalence and/or dysphoria regarding gender and assists in better adjustment to incarceration.
> > 2. Appropriate psychiatric care.
> > 3. Hormonal treatment, in the circumstances described below.
> > 4. Other treatment determined to be medically necessary by the Transgender Committee

C.  Established Hormone Treatment

4

1. An inmate who is receiving hormonal medication at the time of DOC intake may be continued on hormonal medication, provided the following conditions are met:

    a. The hormones represent an established treatment that has been prescribed under the supervision of a qualified physician.

    b. The inmate cooperates with DOC staff in obtaining written records or other necessary confirmation of his or her previous treatment.

    c. DOC health care staff determine the hormones are medically necessary and not contraindicated for any reason.

2. Hormonal therapy shall be managed by a DOC physician and/or medical consultant.

3. If an inmate chooses to discontinue hormonal medications while incarcerated and then wishes to restart hormonal medications, the Transgender Committee shall evaluate the request and make a determination.

D. New Hormonal or Surgical Treatment

1. Health care staff who receive an initial request from an inmate for hormonal therapy or surgical procedures shall forward the request to the PSU Supervisor.

2. The PSU Supervisor shall assign a member of the PSU staff to conduct an initial evaluation to help determine whether a GD diagnosis is appropriate and whether a more specialized evaluation from a GD consultant is needed. The initial evaluation shall include:

    a. A review of any prior medical or mental health treatment records related to gender dysphoria. The inmate needs to cooperate with DOC staff in obtaining written records or other necessary confirmation of previous treatment, if present.

    b. A detailed description of the inmate's reported gender dysphoria issues.

    c. Observations of housing unit staff, when relevant.

    d. General mental health history in DOC and in the community, including diagnoses.

e. Emotional and behavioral stability within DOC, including adherence to prior treatment recommendations.

f. Current mental status.

3. The PSU staff member shall submit his/her report to the Mental Health Director, who shall review the PSU report and determine whether a GD consultant is needed for any of the following:

a. Telephone consultation.

b. Review of the health care record.

c. A more comprehensive in-person evaluation.

4. If a GD consultant conducts an in-person evaluation of a potential GD inmate, he/she shall forward a written report with treatment recommendations to the Mental Health Director for review. For any affirmative recommendations for hormone therapy or other medical interventions, the Mental Health Director shall review the report with the Transgender Committee for approval by the Committee. The Mental Health Director shall approve or deny the recommendations.

5. Recommendations from the GD consultant are not binding on the DOC; the Bureau of Health Services has the authority and responsibility to determine what constitutes an inmate's necessary medical care.

6. If new information becomes available that would significantly affect an earlier recommendation (e.g. prior treatment records become available), the Mental Health Director may request a new evaluation or reconsider prior treatment decisions.

7. Due to the limitations inherent in being incarcerated, a real-life experience for the purpose of gender-reassignment therapy is not possible for inmates who reside within a correctional facility. However, treatment and accommodations may be provided to lessen gender dysphoria.

(Dkt. 75:9.)

16. The current gender dysphoria committee came into its modern incarnation in 2011. The roles of the committee include: facilitating inter-

disciplinary communications, reviewing specific inmate requests for services/treatments and property, interpreting current policy and developing future policy. (Dkt. 56:113-114.)

17.   The committee meets on a monthly basis to discuss requests from individual inmates, including property requests.  (Dkt. 56:122.)

**D. Treatment of DOC inmates with gender dysphoria.**

18.   From 2011 through the present, approximately 160 inmates have requested transgender services, including the initiation of hormone therapy. (Dkt. 56:22, 95.)

19.   Approximately eight inmates have requested sex reassignment surgery (SRS). (Dkt. 56:22, 95.)

20.   Currently, the only Wisconsin prison that provides group therapy options specifically for transgender inmates is Oshkosh Correctional Institution.  (Dkt. 56:111-112.)

21.   There are practical difficulties in running formal support groups in the prisons, including the fact that the number of transgender inmates at any given prison may not be enough to have a support group.  (Dkt. 56:111-112.)

22.   DOC does not make treatment decisions based upon policy alone, but looks to individual clinical circumstances of the patient, including whether

the treatment is clinically appropriate, relative risks and benefits, and cost. (Dkt. 56:42, 45.)

23.    No DOC inmate has undergone sex reassignment surgery while incarcerated. (Dkt. 56, Kallas Dep. at 133: 18-134:2.)

## II.    The sex reassignment procedures for a male-to-female transgender individual.

24.    Sex reassignment surgery (SRS) for a male-to-female transgender individual involves removal of the testes and spermatic cord (radical orchiectomy), removal of the penis (penectomy), and creation of a vagina (vaginoplasty). (Dkt. 65, Oriel Report at pg. 4.)

25.    For a vaginoplasty performed on an individual born with a vagina, the vaginoplasty involves revision or reconstruction of an anatomical vagina. (Dkt. 56:142-143.)

26.    With respect to SRS for a male-to-female transgender individual, vaginoplasty involves the removal of male tissue to create a vaginal vault, inverting the skin of the penis and creating a vaginal wall, removing the testicles, and creating labia.  (Dkt. 56:142-143.)

27.    DOC has no records of providing vaginoplasty to any inmate (including inmates born with a vagina) for any condition. (Dkt. 56:143:10-22.)

28.    DOC previously approved orchiectomy for an inmate with gender dysphoria, to address complaints of testicular pain (not gender dysphoria), but

DOC was unable to find a surgeon willing to perform the surgery before the inmate was released from DOC's custody. (Dkt. 56:146.)

## III. Standards set forth by the World Professional Association for Transgender Health

29.     The World Professional Association for Transgender Health (WPATH) is the most widely recognized set of standards for treating transgender individuals, though the standards remain controversial to the extent that not all practitioners agree with them.  (Dkt. 56:57-58, 65.)

30.     Dr. Kallas does not agree with a statement in WPATH that relates to the applicability of the standards to institutionalized persons. Even though this particular statement is controversial, Dr. Kallas refers to other sections of the WPATH standards for guidance in his position as medical director.  (Dkt. 56:57-58, 65.)

31.     In Dr. Kallas's professional opinion, the WPATH statement that the standards should apply "in their entirety" to institutionalized persons is objectionable. (Dkt. 56:58-59.)

32.     The WPATH standards do not recognize that inmates have very different life histories than most transgender individuals. (Dkt. 56:58-59.)

33.     The WPATH standards do not recognize that inmates have different mental and personality vulnerabilities. (Dkt. 56:58-59.)

34.     The WPATH standards do not recognize that inmates have a different life circumstance by virtue of being in prison. (Dkt. 56:58-59.)

35.     The WPATH standards do not recognize that incarcerated persons have significant limitations on their freedom.  (Dkt. 56:58-59.)

36.     The WPATH statement regarding the applicability of the standards to institutionalized persons is an advocacy statement that is not backed by scientific principles or data. (Dkt. 56:58-59.)

37.     There currently is no database, literature, or scientific evidence that reviews outcomes of treating transgender individuals who are in prison. (Dkt. 56:59.)

38.     The term "real-life experience" was removed from the most current WPATH standards. (Dkt. 56:60.)

39.     In the non-incarcerated population, a "real-life experience" is a prerequisite that must be met before a medical professional recommends SRS for a non-incarcerated individual.  (Dkt. 56:61-62.)

40.     The DOC policy on gender dysphoria defines a real-life experience as follows:

> The act of fully adopting a new gender role in everyday life, allowing an individual to experience and test the consequences of the new gender role in the areas of employment, housing, education, and relationships with friends, family and significant others. The experience allows for a range of different life experiences and events that may occur throughout the year (e.g., family events, holidays, vacations, season-specific work or school experiences). During this time, individuals present consistently, on a day-to-day basis and across all settings of life, in their desired

gender role. The real life experience tests the individual's resolve, the capacity to function in the preferred gender, and the adequacy of social, economic, legal and psychological supports.

(Dkt. 75:9.)

## IV.   Campbell's gender dysphoria.

### A. Campbell's background pre-incarceration.

41.    Campbell began her incarceration in 2007 for first-degree sexual assault. Her mandatory release date is 2041, without the possibility of parole. (Dkt. 70:40-41.)

42.    Campbell had one transgender friend before her incarceration, though she cannot recall her name. (Dkt. 70:16.)

43.    Campbell was married before her incarceration, though she is now divorced.  (Dkt. 70:42.)

44.     Before her incarceration, Campbell occasionally cross-dressed, shaved, wore make-up, and wore women's clothing. (Dkt. 70:42-43.)

45.    Before her incarceration, Campbell did not continuously live as a woman at any time. (Dkt. 70:52-53.)

46.    Before her incarceration, Campbell did not participate in any support groups for transgender individuals.  (Dkt. 70:43.)

47.    Before her incarceration, Campbell did not receive professional medical treatment for her gender dysphoria, though she claims that she tried to obtain hormones at one point, but the doctor "blew her off." (Dkt. 70:44.)

48.    Campbell eventually purchased hormones on the internet, and used them daily for about six months. (Dkt. 70:49.)

49.    Campbell stopped taking the hormones because she could not afford them, and expense was the only reason that she discontinued the hormones. (Dkt. 70:50.)

50.    Campbell never discussed the possibility of SRS with any health care provider prior to her incarceration. (Dkt. 70:65.)

51.    Campbell planned to use her 2008 tax return to travel out of the country for SRS.  She never discussed SRS with a domestic health care provider and just "went with what was affordable to me."  (Dkt. 70:65-66.)

52.    Campbell first identified herself as transgender at Mendota Mental Health in 2007, after she was charged with the crime that resulted in her current incarceration. (Dkt. 70:47.)

B. **Evaluation and diagnosis of Campbell's gender dysphoria.**

53.    At DOC's request, Campbell was evaluated by Osborne in 2012 and 2014. (Dkt. 2-1, 74.)

54.    Osborne's 2012 report on Campbell "recommend[ed] that the DOC consider the likelihood that feminizing hormone therapy will improve inmate Campbell's functional stability and sense of psychological well-being as long as his particular comorbid vulnerabilities are addressed concurrently." (Dkt. 73.)

55.     Following Osborne's 2012 report, Campbell was provided with hormones for treatment for gender dysphoria. (Dkt. 40:34-36.)

56.     Osborne's 2014 report on Campbell included the following opinion:

Inmate Campbell appears to be highly sensitive to his environment and sometimes struggles to cope effectively with interpersonal conflict. His stability varies based on the degree of support he perceives in his environment. He did not function well at KMCI, where he was quite distressed about aspects of the environment. While it is still rather new, his current placement appears to be enabling him to function with improved stability.

(Dkt. 2-1.)

57.     Osborne's 2014 report on Campbell included the following opinion:

The Wisconsin DOC is wrestling with the challenges that inevitably emerge in efforts to respond humanely and with clinical prudence to gender dysphoric inmates. Treating inmates with hormones and making allowances for some limited female expression opens the door to questions about and demands for other treatments available in the community, including SRS. That demands an examination of the RLE concept in order to determine whether there is a workable approach for inmates.

There may be approaches, such as the creation of a separate housing unit for gender dysphoric inmates at all stages of transition, that have some advantages. Yet, actualizing such an approach, while not impossible, would be undeniably difficult. And while creative approaches may allow for a better approximation of a valid real-life experience, the opportunities they can provide for meaningful exploring, learning, adjusting, and consolidating a feminine identity are still meager if measured against community standards. At this time there are no evidence-based standards to guide such efforts and there is no empirical data on which to rely in efforts to predict whether the absence of a RLE that resembles what is possible in the community unduly increases the risk of harm, regret or dissatisfaction for inmates.

Accordingly, conservative approaches to SRS for incarcerated individuals are wholly warranted. It seems prudent to consider that SRS may be justified in rare cases for inmates with very long or life sentences, persistent, severe anatomic gender dysphoria, well managed

comorbidity, history of treatment compliance and cooperative relationships with providers, who demonstrate an understanding of the risks and who have the capacity to give informed consent, and for whom alternatives have been considered, attempted or ruled out.

For inmate Campbell, the past year and a half on cross-sex hormones has been undeniably helpful toward his desired transition to full female identity. Experiencing himself in an increasingly feminized identity and, now (since his transfer to OSCI) developing a sense of belonging to a peer community with other transgender inmates, have facilitated improved stability and diminished symptoms of depression. Treatment has fostered a new sense of hopefulness in an inmate who struggles to identify reasons to live. It has also strengthened his resolve for a full transition. Yet, it has done so in an extremely restricted environment that in no way resembles what his life would be post-SRS. The degree to which that increases the risk of dissatisfaction, regret or harm is unknown.

(Dkt. 2-1.)

58.   Osborne's 2014 report on Campbell included the following summary conclusion:

Based on my review of inmate Campbell's records from the past few years, my experience of the inmate during extensive interviewing, my consultation with his PSU clinician, and consideration of the factors discussed in this report, there are two potential contraindications to SRS, described below.

The first involves the challenges related to the real-life experience, which has long been a required criterion for SRS according to the standards of care generally used in community practice. An RLE as understood by most community experts and lived by most community patients is not possible in an incarcerated setting. Taking hormones does not in and of itself constitute a real-life experience in any meaningful application of the concept. Although inmate Campbell does not agree with this, his experience taking cross-sex hormones for the past year and a half does not, in my judgment, constitute a valid RLE.

At the same time, there is a lack of evidence that the RLE is predictive of better outcomes. It is a concept based more in tradition than science. Further, departures from the RLE standard are sometimes made in the community and may be justifiable in rare circumstances in correctional

settings. My best judgment is that those cases will be ones where inmates have very long or life sentences, unambiguously severe and unremitting anatomic dysphoria, well-managed comorbid conditions, a history of treatment compliance and cooperative relationships with providers, who demonstrate an understanding of the risks and can give informed consent, and for whom alternatives have been thoroughly considered, attempted or ruled out.

There are undeniable challenges to efforts to determine when and how to structure a departure from the RLE standard. In the community we assume that an individual's real-life experience or pre-operative life setting will match or closely resemble the individual's life setting post-operatively. Envisioning how that can be approximated in incarcerated settings, while avoiding undue risk and unguided experimentation, is challenging to say the least. I know of no prison system to date that has successfully implemented a solution to this challenge.

The time remaining in inmate Campbell's incarceration is unknown. He has an extended supervision date in 2041, nearly three decades away. Accordingly, he may be 70-years-old when released. If the DOC determines that waiving or modifying the RLE as traditionally understood in community practice is a humane and clinically valid decision in rare cases of gender dysphoric inmates, inmate Campbell may an appropriate candidate for SRS, given his long sentence, the chronicity and severity of his dysphoria, and his current functional stability. As I have noted numerous times, while he carries some elevated risk factors related to comorbidity, those risk factors are not extreme and his comorbid conditions are currently adequately managed. He is demonstrating a capacity to function with improved stability when he is provided a sufficiently supportive environment. Accordingly, he represents a case where the potential benefits may outweigh the risks.

The second contraindication is the fact that the benefits from the cross-sex hormone treatment currently being implemented have not yet been optimized for this inmate. The treatment has been undeniably helpful psychologically, facilitating diminished dysphoria and fostering hopefulness in a profoundly dysphoric individual. However, based on the inmate's self-reports, the physiological benefits are not yet optimized. As noted earlier, the prescribing physician had recommended dosage adjustments but those had not yet been implemented at the time of my interview with the inmate. Additional adjustments may be indicated as well before maximum benefit has been achieved. In the community some individuals find sufficient relief from dysphoria on hormones alone. The treatment should be given every chance before irreversible treatments

such as SRS are implemented. When maximum benefit has been achieved, the severity level of the inmate's gender dysphoria should be reassessed. SRS or alternative interventions may be appropriate at that time.

There is no diagnostic uncertainty in this case and no uncertainty that this inmate suffers chronic and severe anatomic gender dysphoria that precedes his incarceration. While cross-sex hormones have been helpful, the inmate remains severely gender dysphoric. While he has some undeniable risk factors, he is stable at this time, which has been facilitated by cross-sex hormones and placement in an environment that he experiences as supportive. Given the chronicity and severity of his dysphoria, the tenacity of his desire to transition to full female identity, and his length of sentence, it is unlikely that his dysphoria will remit without SRS or other feminizing interventions.

When maximum benefits from cross-sex hormones have been achieved, if the inmate remains stable, and if and when a safe and reasonable approach to resolving the RLE conundrum is determined, inmate Campbell may be an appropriate candidate for SRS. If the DOC determines that SRS is not feasible, then I recommend that additional accommodations be considered that may further reduce the inmate's dysphoria and support him in his process of transition by affording him more opportunities and mechanisms to express and consolidate a feminine identity.

(Dkt. 2-1.)

59. Following Osborne's 2014 report, Campbell's treatment for gender dysphoria included optimization of hormone treatment. (Dkt. 40:34-36.)

60. There are two issues that Dr. Kallas believes negatively impacts Campbell's suitability for sex reassignment surgery. First is the inability for Campbell to have a real-life experience which might prepare her for life as a female in a female prison. Second is Campbell's ongoing personality-based vulnerabilities, including Campbell's history of emotional reactivity, "black-

and-white" thinking, lack of introspection and psychological insight.  (Dkt. 56:171.)

### C. Psychological and medical care provided to Campbell.

61.    Campbell is satisfied with the psychological care that she has received in prison. (Dkt. 70:11, 48.)

62.    Campbell has no complaints about any of the healthcare providers in the Psychological Services Unit (PSU) or the Health Services Unit (HSU) at Racine. (Dkt. 70:11, 48.)

63.    As of November of 2017, Campbell is seen on average once every three months in PSU.  But, if she requests to see PSU more often, she submits a request form and PSU schedules an appointment. (Dkt. 70:11, 48.)

64.    Campbell denies mental health concerns other than her gender dysphoria, because "it all stems from my gender dysphoria." (Dkt. 70:47.)

65.    Campbell's mental health has been stable since she started hormones on January 20, 2013. (Dkt. 70:49.)

66.    Campbell believes that her mental health concerns are "definitely" well controlled and stable at this point, because she has learned different methods of coping through therapy. (Dkt. 70:47-48; 49.)

67.    One coping mechanism that Campbell uses is "radical acceptance," which she describes as "accepting the things I cannot change." (Dkt. 70:48.)

68.     Campbell has not experienced any side effects associated with the hormones over the past five years. (Dkt. 70:50-51.)

69.     Campbell is pleased with the physical effects the hormones have had, though she wishes her breasts were larger. (Dkt. 70:50-51.)

70.     Dr. Betsy Luxford is the medical doctor that has monitored Campbell's hormones over the years. (Dkt. 70:51.)

71.     Campbell does not have any complaints about the manner in which Dr. Luxford has treated her. (Dkt. 70:51.)

### D. Campbell's daily prison life.

72.     Campbell has been employed as a janitor in Racine's HSU since November 14, 2017. Before that job, she worked as a special care assistant, helping handicapped inmates. (Dkt. 70:17.)

73.     Campbell denies that her incarceration has had a negative impact on her mental health because her incarceration "helped [her] actually come out as Nicole." (Dkt. 70:42.)

74.     Campbell is interested in participating in group therapy, and has made a request for it by submitting a PSR at Racine. Campbell believes this request was denied due to limited staff resources.  (Dkt. 70:17.)

75.     Although she does not have a formal, prison-sponsored support group, Campbell socializes with transgender inmates on a daily basis in prison and she considers this an informal support group. (Dkt. 70:17, 66.)

18

76.    As an inmate in a medium-security wing at Racine, Campbell is free to socialize with inmates during mealtimes and in the dayroom for most of the day. (Dkt. 70:18.)

77.    Campbell and the other transgender inmates read, play games and watch television together in the prison's dayroom. Campbell spends about three hours per day in the dayroom, with at least one or two of the hours socializing with other transgender inmates (Campbell is one of a group of at least five transgender inmates housed together). They also discuss transgender issues, and routinely discuss property that they wish they were allowed to have, including women's sweatpants, makeup, "bras besides sports bras", voice therapy, electrolysis and sex confirmation surgery. (Dkt. 70:19, 25, 55, 63.)

78.    Campbell shaved to remove hair prior to her incarceration, though she explored the possibility of electrolysis before she was sent to prison.  (Dkt. 70:53.)

79.    Campbell also regularly socializes with non-transgender inmates. (Dkt. 70:26.)

80.    Campbell considers herself bi-sexual and has had sexual experiences in prison. (Dkt. 70:43.)

81.    Her most recent relationship was with an inmate at Kettle Moraine in September, 2017. (Dkt. 70:43.)

82.    A typical day for Campbell includes waking up, making coffee, watching TV in the dayroom and socializing prior to lunch.  After lunch, the prison does a "count", and after count, Campbell goes to her job in the HSU. After she completes her two-hour shift at work, she returns to her housing unit, socializes, or participates in recreation. (Dkt. 70:54.)

83.    Campbell rates the support of DOC personnel at Racine Correctional Institution as "9/10." (Dkt. 72:4.)

84.    DOC personnel at Racine Correctional Institution use Campbell's female name and pronouns. (Dkt. 72:4.)

### E. Campbell's allowed property

85.    Hair removal options for inmates include a razor and electric razor. (Dkt. 70:21.)

86.    Campbell has feminine clothing including bras, panties, and a sleep shirt. (Dkt. 70:23.)

87.    Chap Stick, lotions, female deodorant, scented body wash and scented shampoos are available to male inmates. (Dkt. 70:22-23.)

88.    Campbell has made makeup using cocoa butter cream and coffee. (Dkt. 70:22-23.)

89.    Campbell desires eyeliner, foundation, mascara and gloss, or "light" lip stick. (Dkt. 70:22.)

90.    Campbell wears feminine, pink-framed glasses. (Dkt. 70: 22.)

**F. Campbell's issues with other inmates.**

91.     Campbell described only one inmate that made her feel uncomfortable at Racine. The inmate reportedly wrote sexual letters and requested sexual favors from Campbell.  When Campbell complained, a PREA investigation was conducted and the offensive inmate was disciplined. (Dkt. 70:38-39.)

**G. Campbell's post-surgical expectations.**

92.     If she undergoes SRS, Campbell expects to move to Wisconsin's women's prison, Taycheedah Correctional Institution. (Dkt. 70:56.)

93.     Campbell does not believe that a transfer from a male prison to a female prison would impact her daily activities, and believes that she may be happier and more sociable because she would "fit into where I belong." (Dkt. 70:56.)

94.     Campbell has not spoken with any Taycheedah inmates about what day-to-day life is like.  (Dkt. 70:67.)

95.     Campbell believes that she would have a peer group to socialize with at Taycheedah because she would "find the transsexual inmates, advocate for them and try to help them as much as I can." (Dkt. 70:67.)

96.     Campbell is a self-described "very sociable person, and I get along with people real well." (Dkt. 70:57.)

97.    Campbell has been able to get along with people at Racine, and has many friends at the prison, not limited to transgender inmates. (Dkt. 70:57.)

98.    Campbell admits that she may have possible acceptance issues at a women's prison. (Dkt. 70:57.)

## V. The opinions of Campbell's experts.

### A. Dr. Oriel

99.    Dr. Oriel was hired by the plaintiff to determine whether Campbell did, in fact, have gender dysphoria, and to offer opinions as to whether treatment provided by DOC is consistent with the applicable standards of care. (Dkt. 68:6.)

100.    It is Dr. Oriel's opinion that SRS is not always medically necessary to treat a patient with gender dysphoria. (Dkt. 68:28.)

101.    Dr. Oriel considers a number of factors to determine whether SRS is medically necessary for a patient, including the degree of the patient's distress, the length of that distress, the consistency of the desire to transition, and the patient's goals and expectations of the procedure.  (Dkt. 68:28.)

102.  SRS is a major procedure and a contraindication would be a patient's "magical thinking that having that procedure will, for instance, make them a movie star" and unrealistic expectations of what the surgery can do for them. (Dkt. 68:29.)

103.   If Dr. Oriel believes that a patient's expectations are highly unrealistic, she will not recommend the patient for surgery.  (Dkt. 68:29.)

104.   Dr. Oriel believes that Campbell has realistic expectations about the procedure because Campbell understood the basic anatomical steps of the surgery, the recovery period and the self-care that is required. (Dkt. 68:30.)

105.   Dr. Oriel described Campbell as currently psychologically stable, but she does not know how long this has been the case. (Dkt. 68:37.)

106.   If Campbell undergoes SRS, Dr. Oriel believes that the surgery will "likely" have a "very positive" effect on Campbell's mental health. This is based on her professional experience and what Dr. Oriel described as "limited medical literature." (Dkt. 68:37.)

107.   Campbell did not share with Dr. Oriel any expectations that Campbell had regarding what her life would be like once she is transferred to a women's prison. (Dkt. 68:38.)

108.   In Dr. Oriel's opinion, the most important components of the real-life experience are sharing one's gender identity with health care professionals, peers and the people one interacts with day to day.  (Dkt. 68:57.)

109.   Dr. Oriel believes that "to the extent the real-life experience matters, Campbell has completed it." Her conclusion is based on the fact that Campbell is public about her female gender identity.  (Dkt. 68:58.)

110.   With regard to Campbell's request for SRS, Dr. Oriel opined as follows:

> Ultimately, the failure to provide Nicole with adequate medical care—most importantly gender confirmation surgery—has caused Nicole to suffer unnecessarily. It is my opinion that the Defendants' actions and inactions here run counter to the generally accepted standards and practices of those who specialize in treating transgender individuals.

(Dkt. 65-1:20.)

111.   Dr. Oriel does not have an opinion regarding whether it is realistic for Campbell to expect that she will be accepted at a women's prison after she has SRS. (Dkt. 68:63.)

112.   Dr. Oriel believes that an orchiectomy would relieve some of Campbell's distress, but does not believe that Campbell's gender dysphoria would be alleviated completely because Campbell will continue to have distress about her penis. (Dkt. 68:64.)

113.   Dr. Oriel does not have an opinion as to whether breast augmentation is medically necessary to treat Campbell's gender dysphoria. (Dkt. 68:20.)

114.   Dr. Oriel is unaware of any professional standards that address the specific issue of when breast augmentation may be medically necessary for a patient with gender dysphoria. (Dkt. 68:22.)

115.   Dr. Oriel has not opined as to the appropriateness or necessity of electrolysis to treat Campbell's gender dysphoria. (*See* Dkt. 65-1, Oriel Report, Dkt. 68:19:3-24.)

116.   Dr. Oriel has not opined as to the appropriateness or necessity of Campbell having access to makeup to treat Campbell's gender dysphoria. (*See* Dkt. 65, Oriel Report.)

117.   Dr. Oriel does not have any opinion regarding whether Campbell is likely to be victimized following SRS. (Dkt. 68:66.)

118.   Dr. Oriel has no experience treating a patient that has undergone SRS while in prison.  (Dkt. 68:69.)

119.   Dr. Oriel is not aware of any research or publications regarding prison inmates that have undergone SRS while incarcerated. (Dkt. 68:69.)

120.   According to Dr. Oriel, there are only ten states that prohibit health insurers from excluding coverage for care related to gender transition. Wisconsin has no such prohibition. (Dkt. 68:50.)

121.   Dr. Oriel considers standards set forth in the Center for Medicare and Medicaid Services as "an indication of what is standard medical practice." (Dkt. 68:14)

122.   Dr. Oriel has treated patients with gender dysphoria that were denied SRS by Medicaid or Medicare. (Dkt. 68:42.)

**B. Felicia Levine**

123.   Felicia Levine is a licensed clinical social worker, board-certified sexologist, hypnotherapist, and board certified transgender care therapist. (Dkt. 63-2.)

124.   Levine was asked to provide an expert opinion concerning "Campbell's mental health and gender dysphoria, and the appropriateness for gender confirmation surgery." (Dkt. 63-1:3.)

125.   Levine's expert report contains no opinions as to the appropriateness or necessity of electrolysis. (Dkt. 63-1:3.)

126.   Levine's expert report contains no opinions as to the appropriateness or necessity of feminine voice CDs. (Dkt. 63-1:3.)

127.   Levine's expert report contains no opinions as to the appropriateness or necessity of Campbell having access to makeup. (Dkt. 63-1:3.)

128.   Levine's expert report contains no opinions as to the appropriateness or necessity of Campbell having breast implants. (Dkt. 63-1:3.)

129.   Levine's expert report contains no opinions as to the appropriateness or necessity of Campbell being allowed to wear female clothing post-SRS. (Dkt. 63-1:3.)

130.   Levine believes Campbell should undergo electrolysis because she "thinks it will lessen her dysphoria." (Dkt. 69:11:2-6.)

131.   Levine did not investigate whether any inmates in the Wisconsin prison system—male or female—have been allowed to have electrolysis when incarcerated. (Dkt. 69:11:7-10.)

132.   Levine was not aware if Campbell has access to a razor. (Dkt. 69:11:11-13.)

133.   Levine believes Campbell should have access to makeup. (Dkt. 69:13:11-14:4.)

134.   Levine is "not sure" what specific makeup Campbell should have access to and stated: "This is not a scientific answer, but lip gloss, some blush. What she requests that is within reason." (Dkt. 69:15:22-16:2.)

135.   Levine stated Campbell should be allowed to possess "[a]nything that can help a transgender woman feel more like an actual woman . . . ." (Dkt. 69:23:1-3.)

136.   Levine has no understanding of any security implications of allowing Campbell to possess or utilize makeup while incarcerated. (Dkt. 69:16:3-8.)

137.   Levine believes Campbell should be allowed to have breast implants. (Dkt. 69:16:9-13.)

138.   Levine does not know if female inmates at Taycheedah Correctional Institution are allowed to undergo breast augmentation surgery while incarcerated. (Dkt. 69:16:18-22.)

139.   Levine acknowledges Campbell currently has breasts from the estrogen hormones she takes. (Dkt. 69:16:16-17.)

140.   Levine does not believe Campbell's breasts are "full breasts" or "real breasts." (Dkt. 69:17:9-12; 23.)

141.   Levine cannot explain why Campbell does not have "real breasts," and admitted: "I'm not a doctor, I cannot elaborate on that." (Dkt. 69:17:23-18:2, 19:3-5.)

142.   Levine agrees that not all patients with gender dysphoria require SRS and that the decision must be made on a case-by-case basis. (Dkt. 69:46:2-13.)

143.   Levine acknowledges that, in determining whether someone is a good candidate for SRS, it is important to consider what their life will be like after the surgery. (Dkt. 69:35:19-22.)

144.   Levine believes Campbell should be moved to a female prison if she undergoes SRS surgery. (Dkt. 69:31:2-9.)

145.   Levine does not know the differences between a male and female prison. (Dkt. 69:33:6-8.)

146.   Levine does not know what changes there will be in Campbell's day-to-day life if she moves to a female prison after SRS surgery. (Dkt. 69:33:20-23.)

147.   Levine did not speak with Campbell about any concerns she may have if she is moved to a female prison. (Dkt. 69:34:12-16.)

148.   Levine does not know if Campbell would be subject to less verbal harassment if she undergoes SRS and is placed in a female prison. (Dkt. 69:38:12-15)

149.   Levine and Campbell did not discuss Campbell's current socialization in prison on a day-to-day basis. (Dkt. 69:60:7-9.)

150.   Levine does not know how much contact Campbell currently has with the five other transgender inmates housed at Racine Correctional Institution. (Dkt. 69:38:24-39:8.)

151.   Levine does not know how it would affect Campbell to be moved to a female prison and lose contact with other transgender inmates. (Dkt. 69:39:20-25; 40:4-9.)

152.   Levine does not know what would happen if Campbell did not like living in a female prison after undergoing SRS. (Dkt. 69:42:28-25.)

153.   Levine does not know whether Campbell's life would be better or worse if she is moved to a female prison. (Dkt. 69:57:25-58:16.)

154.   In determining whether Campbell has undergone a "real life experience" as a woman, Levine could not recall discussing with Campbell what her daily life and routines are like in prison. (Dkt. 69:60:3-6.)

155.   Levine cannot testify to the physical risks of undergoing SRS surgery. (Dkt. 69:42:8-10.)

156.   Levine cannot recall treating any patients with gender dysphoria who were incarcerated at the time of treatment. (Dkt. 69:29:5-9.)

157.   Levine did not review any jail or prison policies before forming her opinions as to the appropriateness of SRS for Campbell. (Dkt. 69:29:25-30:2.)

158.   Levine does not recall reviewing any professional literature about the psychological risks of SRS surgery in a prison setting. (Dkt. 69:45:11-14.)

159.   Levine is not aware of any studies performed by WPATH relating to incarcerated individuals and SRS surgery. (Dkt. 69:47:10-12.)

160.   Levine does not recall reviewing any professional literature regarding transgender individuals in prison. (Dkt. 69:47:20-23.)

161.   Levine does not recall reviewing DAI policy 500.70.27 in forming her opinions. (Dkt. 69:72:21-74:2.)

162.   Levine agrees that Campbell's gender dysphoria is currently "well-controlled." (Levine Dep. 56:18-21.)

## VI.   The opinions of Defendants' expert.

163.   Chester Schmidt Jr., M.D. is a professor of psychiatry with the Johns Hopkins University Sex and Gender Clinic.  Dr. Schmidt is an adult psychiatrist with a specialty in human sexual disorders.  (Dkt. 61:9; 36.)

164.   Over the course of his forty years as a psychiatrist, Dr. Schmidt has clinically evaluated approximately 10 to 15 patients per year for gender dysphoria. In addition to independently evaluating patients as part of his medical practice, Dr. Schmidt is also an attending physician and is consulted by other health care providers at Johns Hopkins.  (Dkt. 61:27.)

165.   Dr. Schmidt estimates that he has worked with between 800 and 900 patients with gender dysphoria over the course of his career. (Dkt. 61:27.)

166.   Of the roughly 800 to 900 patients that Dr. Schmidt has interacted with over the years that had gender dysphoria, about fifty percent were seeking SRS. Dr. Schmidt estimates that of the surgery-seeking group, approximately 15 percent underwent SRS.  (Dkt. 61:34-35.)

167.   Dr. Schmidt agrees with other professionals in his field that surgical management of gender dysphoria may be medically necessary in some circumstances. (Dkt. 61:61.)

168.   In Dr. Schmidt's opinion, SRS may be medically necessary if a given patient is so distraught about their status that they could not function in the normal spheres of life because of their perceived sense of the need to have a different anatomy. (Dkt. 61:65.)

169.   Gender dysphoria is not cured, it is managed. (Dkt. 61:79.)

170.   In his medical practice, Dr. Schmidt does not recommend surgery for a particular patient, but will write a letter on a patient's behalf that surgery

is not contraindicated for his patient. If one of his patients desires surgery and there is no contraindication for it, Dr. Schmidt will write a letter indicating the same. (Dkt. 61:63.)

171.   In Dr. Schmidt's professional opinion, it is important to live fully in the cross-gendered role for a year before undergoing SRS.  (Dkt. 61:86.)

172.   Although Campbell claims that she is distressed about her anatomy, Dr. Schmidt's examination of Campbell's mental state did not demonstrate any significant level of distress. (Dkt. 61:79.)

173.   In Dr. Schmidt's evaluation of Campbell, she reported that she had a sexual relationship within the past year. In that, she experienced arousal with a semi-erect penis and orgasmic release with a small amount of ejaculate. (Dkt. 72:3, Schmidt Report.)

174.   Campbell's sexual experiences in prison that will dramatically change if she has SRS.  (Dkt. 61:95.)

175.   Dr. Schmidt also diagnosed Campbell with pedophilic disorder, which he believes is a contraindication to having SRS. (Dkt. 61:105.)

176.   Dr. Schmidt reached the diagnosis of pedophilic disorder after reviewing Campbell's records, which include references to the crime for which he is incarcerated: sexually assaulting his ten-year-old daughter. (Dkt. 61:105; Dkt. 74:2.)

177.   Campbell's history and pedophilic diagnosis suggests that Campbell will engage in sexual acts available to her and that she is a "sexual opportunist." (Dkt. 61:109.)

178.   There is not an applicable standard of care for patients in a prison setting because surgical treatment of gender dysphoria in a prison setting is so new and so rare that it will take years before there is sufficient data to support a particular standard of care applicable in the prison setting. (Dkt. 61:83-84.)

179.   In the entire country, only one incarcerated gender dysphoric inmate has undergone SRS while incarcerated. That inmate is housed in California. (Dkt. 61:84.)

180.   There is not a single, scientific article that discusses or describes the applicable standard of care or guidelines for surgical management of transgender prison populations. (Dkt. 61:116.)

181.   Dr. Schmidt opines that SRS is not medically necessary for Campbell:

[A]lthough the issue of medical necessity is not addressed directly by the Plaintiff's experts, in my professional opinion, surgical reassignment surgery is not medically necessary for Nicole. She has made a very good social, behavioral and administrative adjustment to prison life. Her success is in no small part due to the flexible adjustments in policy and support afforded her by the Institution during her transition. SRS is unlikely to cause any additional improvements in her functional capabilities within the prison setting for the remainder of her incarceration.

(Dkt. 72:7.)

Dated this 9th day of February, 2018.

Respectfully submitted,

BRAD D. SCHIMEL
Wisconsin Attorney General


s/ Laure Rakvic-Farr
LAURE RAKVIC-FARR
Assistant Attorney General
State Bar #1049540

TIMOTHY BARBER
Assistant Attorney General
State Bar # 1036507

ANN M. PEACOCK
Assistant Attorney General
State Bar #1046175

Attorneys for the Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0323 (Rakvic-Farr)
 (608) 267-8906 (Fax)
rakvic-farrlc@doj.state.wi.us