UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

MARK A. CAMPBELL A/K/A NICOLE
ROSE CAMPBELL,

        Plaintiff,

       v.                                 Case No. 16-cv-261-jdp

KEVIN KALLAS et al.,

        Defendant.

**PROPOSED FINDINGS OF FACT IN SUPPORT OF PLAINTIFF CAMPBELL'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Mark A. Campbell a/k/a Nicole Rose Campbell, by her attorneys, respectfully submits the following Proposed Findings of Fact ("PFOF") in support of her Motion for Summary Judgment.

## BACKGROUND

**I.    Campbell's gender identity**

1.    Campbell was born in 1971. (Declaration of Mark Campbell a/k/a Nicole Rose Campbell ("Campbell Decl.") ¶ 3, ECF No. 76.)

2.    Gender identity is fixed as of early childhood, if not before. (Deposition of Chester Schmidt ("Schmidt Dep.") Jan. 26, 2018, 53:21–25, ECF No. 61; First Declaration of Kathy Oriel ("Oriel Decl. I") Oct. 16, 2017, ¶ 3, Ex. A at 3, ECF Nos. 65 & 65-1.)[1]

3.    Campbell knew from a very young age that she identified as female and has lived as a woman in many aspects of her life for years. (Campbell Decl. ¶¶ 5, 7, 12, 31–35, 40–42;

---

[1] (*See also* Second Declaration of Kathy Oriel ("Oriel Decl. II"), Nov. 15, 2017, ECF No. 66.)

MIL-29063830-1

First Declaration of Felicia ("Levine Decl. I") Oct. 16, 2017, ¶ 3, Ex. A at 6, ECF Nos. 63 & 63-1.)[2]

4. Campbell always felt closest to the women in her life. (Campbell Decl. ¶ 6.)

5. To express her identity, Campbell often dressed in her sisters' clothes. (*Id.* ¶ 7.)

6. Campbell's family did not approve of her female gender expression. (*Id.* ¶ 9.)

7. Campbell's father beat her and her siblings teased her. (*Id.* ¶¶ 14–15.)

8. When Campbell was about five years old, her mother took her to a psychologist after learning that Campbell was wearing her sisters' clothes and playing with her sisters' dolls. (*Id.* ¶ 11.)

9. Although she continued to wear feminine clothing, the abuse and teasing from her family members caused Campbell to hide her female identity. (*Id.* ¶¶ 12–13.)

10. Campbell's family's disapproval even pushed her to attempt suicide by hanging herself at the young age of six or seven years old. (*Id.* ¶ 17.)

11. Campbell later fell into a cycle of buying women's clothing and then purging them in shame. (*Id.* ¶ 18.)

12. Although Campbell knew she was different from her siblings in some way, she had no idea what being transgender was—or that there were others like her. (*Id.* ¶ 19.)

13. Campbell's discomfort with her physical body escalated through adolescence. (*Id.* ¶ 20.)

14. Campbell was devastated when her testes and phallus began to enlarge, and similarly discouraged when she developed facial hair and a deeper voice. (*Id.* ¶ 21.)

---

[2] (*See also* Second Declaration of Felicia Levine ("Levine Decl. II"), Nov. 15, 2017, ECF No. 64.)

15. Until these changes occurred, Campbell thought that her body would transform into a female body during puberty. (*Id.* ¶ 22.)

16. Once in high school, Campbell remained socially isolated, holding onto a secret she did not understand. (*Id.* ¶¶ 23–25.)

17. To allay her discomfort and depression, Campbell began abusing alcohol in high school. (*Id.* ¶ 26.)

18. Campbell eventually dropped out of high school during the middle of her senior year. (*Id.* ¶ 27.)

19. As is common with some transgender females, Campbell spent her early adulthood pursuing hyper-masculine activities and behaviors. (*Id.* ¶ 28; Levine Decl. I ¶ 3, Ex. A at 7.) For example, she worked at a truck stop and married three times. (Campbell Decl. ¶¶ 29–30.)

20. Near the end of her third marriage, Campbell turned to the internet in hopes of discovering what was "wrong" with her. For the first time, she learned about gender identity, gender dysphoria, and treatment options. (*Id.* ¶¶ 31–33.)

21. Campbell purchased feminizing hormones, silicone breast prostheses, and a wig. (*Id.* ¶ 34.)

22. Campbell had decided that she would use her tax refund to pursue sex reassignment surgery overseas. (*Id.* ¶ 35.)

23. Transgender individuals face discrimination, harassment, and violence in many different settings. (Oriel Decl. ¶ 3, Ex. A at 4.)

## II. Campbell's gender dysphoria and treatment options

24. Campbell has suffered—and continues to suffer—from severe GD. (Deposition of Kevin Kallas ("Kallas Dep.") Sept. 28, 2017, 149:20–25, ECF No. 56; Levine Decl. I ¶ 3, Ex. A

3

at 8; Oriel Decl. I ¶ 3, Ex. A at 13–14; Declaration of Joslyn Benrud ("Benrud Decl."), Feb. 9, 2018, ¶¶ 4 and 12, Ex. 2 ¶¶ 45–47, Ex. 10 at PSU Records 000575–77, ECF No. 75.[3])

25. Campbell's GD has been persistent and is well-documented. (Kallas Dep. 149:20–25; Levine Decl. I ¶ 3, Ex. A at 8; Oriel Decl. I ¶ 3, Ex. A at 13–14; Benrud Decl. ¶ 12, Ex. 10 at PSU Records 000575–77.)

26. Campbell continues to experience symptoms of GD, including anxiety, distress, and dysphoria. (Campbell Decl. ¶ 43.)

27. Cynthia Osborne, the DOC's GD consultant, diagnosed Campbell with "the most severe form of gender dysphoria." (Benrud Decl. ¶ 12, Ex. 10 at PSU Records 000575–77.)

28. SRS is considered an appropriate and standard treatment for GD when medically necessary. (Deposition of Jeffrey Anders ("Anders Dep.") Oct. 10, 2017, 29:12–21, ECF No. 50; Deposition of Gary Ankarlo ("Ankarlo Dep.") Oct. 9, 2017, 29:3–10, ECF No. 51; Deposition of Cathy Jess ("Jess Dep.") Sept. 29, 2017, 69:3–14, ECF No. 55; Kallas Dep. 73:8–11, 75:24–76:9; Deposition of Mary Muse ("Muse Dep.") Sept. 29, 2017, 34:15–24, ; Levine Decl. I ¶ 3, Ex. A at 4–6; Oriel Decl. I ¶ 3, Ex. A at 4–5; *see also* Deposition of Cynthia Osborne ("Osborne Dep.") Oct. 5, 2017, 41:3–6, ECF No. 60; Schmidt Dep. 57:23–58:5; Benrud Decl. ¶ 13, Ex. 11 at 8–10, 26–28, 54–64.)

29. Vaginoplasty involves the reconstruction of tissues to create a vagina. (Oriel Decl. I ¶ 3, Ex. A at 4; *see also* Benrud Decl. ¶ 13, Ex. 11 at 57, 63.)

30. Vaginoplasty is also sometimes medically necessary for non-transgender, biologic females—i.e., individuals assigned female at birth and whose gender identity is female—to treat

---

[3] (*See* Stipulation Regarding Authenticity of Documents, ECF No. 42.)

conditions such as reproductive tract cancers and vaginal damage caused by trauma. (Oriel Decl. I ¶ 3, Ex. A at 5.)

31. Among GD specialists, the generally accepted standards of care for treating GD are contained in the World Professional Association for Transgender Health's *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (the "WPATH Standards of Care"). (Ankarlo Dep. 26:1–17; Schmidt Dep. 81:16–24, 82:25–83:2; *see also* Levine Decl. I ¶ 3, Ex. A at 3–6, 9–12.)

32. Published in 2011, the current version of the WPATH Standards of Care are the product of a five-year-long process during which 18 GD specialists submitted peer-reviewed papers to identify the most effective GD treatments. (Benrud Decl. ¶ 13, Ex. 11 at 109–10.)

33. According to the Defendants, the National Commission on Correctional Healthcare is a reputable and well-respected organization. (Deposition of James Greer ("Greer Dep.") Oct. 10, 2017, 41:13–20, ECF No. 52; Muse Dep. 26:11–20, 27:2–6.)

34. The National Commission on Correctional Healthcare expressly endorses the WPATH Standards of Care and advises prison healthcare providers to follow them. (Benrud Decl. ¶ 15, Ex. 13 at 2, 4.)

35. The Defendant's expert, Dr. Chester Schmidt, agrees that the WPATH Standards of Care are generally accepted among GD specialists. (Schmidt Dep. 82:25–83:2.)

36. Dr. Schmidt relied on the WPATH Standards of Care to evaluate another Wisconsin inmate in the currently pending Eighth Amendment case of *Gulley-Fernandez v. Johnson*, Case No. 15-cv-795-la (E.D. Wis.). (*See* Benrud Decl. ¶ 24. Ex. 22.)

37. In *Gulley-Fernandez*, the state defendants hired Dr. Schmidt to determine whether Gulley-Ferndandez should receive hormone therapy for GD. (*Id.* at 3.)

38. In his expert report in *Gulley-Fernandez*, Dr. Schmidt stated that the WPATH Standards of Care are "[t]he most recognized publication in [the] field . . . ." (*Id.*)

39. Dr. Schmidt then quoted the WPATH Standards of Care's hormone-therapy eligibility criteria and directly applied them to Gulley-Fernandez. (*Id.* at 3–4.)

40. The WPATH Standards of Care set forth six eligibility criteria for vaginoplasty in male-to-female patients:

1. Persistent, well-documented gender dysphoria;
2. Capacity to make a fully informed decision and to consent for treatment;
3. Age of majority in a given country;
4. If significant medical or mental health concerns are present, they must be well controlled;
5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless hormones are not clinically indicated for the individual);
6. 12 continuous months of living in a gender role that is congruent with the patient's identity.

(Benrud Decl. ¶ 13, Ex. 11 at 59.)

### III. Campbell's care in prison and the Defendants' denials of treatment

41. When Campbell was initially incarcerated in 2008, she did not think she would be able to continue taking feminizing hormones. (Campbell Decl. ¶¶ 36–37.)

42. As a result, Campbell struggled with suicidal thoughts. (*Id.* ¶ 38.)

43. After Campbell battled with depression for several years, however, the DOC finally allowed her to restart hormone therapy. (Campbell Decl. ¶ 40; Oriel Decl. I ¶ 3, Ex. A at 10.)

44. Since 2014, Campbell has been taking the optimal dose of hormones. (Campbell Decl. ¶ 41; Deposition of Betsy Luxford ("Luxford Dep.") Oct. 11, 2017, 95:4–97:8, ECF No. 57; Oriel Decl. I ¶ 3, Ex. A at 10.)

45. Hormone therapy has resulted in softer skin, breast development, smaller genitalia, and decreased spontaneous erections for Campbell. (Campbell Decl. ¶ 42.)

46. Still, Campbell's GD symptoms of anxiety, distress, and dysphoria have persisted. (Campbell Decl. ¶ 43; Levine Decl. I ¶ 3, Ex. A at 7; Oriel Decl. I ¶ 3, Ex. A at 6–11, 13–14, 17–18.)

47. Campbell's GD symptoms are the result of incongruity between her female gender identity and her remaining male sex characteristics, especially her genitalia. (Campbell Decl. ¶ 44; Levine Decl. I ¶ 3, Ex. A at 7; Oriel Decl. ¶ 3 & Ex. A, at 13–14, Oct. 16, 2017, ECF Nos. 65 & 65-1.)

48. At least two GD specialists have recommended SRS for Campbell, concluding that it is medically necessary. (Levine Decl. I ¶ 3, Ex. A at 11–12; Oriel Decl. I ¶ 3, Ex. A at 17–18.)

49. Campbell has the capacity to make a fully informed decision and to consent for treatment. (Levine Decl. I ¶ 3, Ex. A at 11; Oriel Decl. I ¶ 3, Ex. A at 17; Benrud Decl. ¶ 12, Ex. 10 at PSU Records 000589–90.)

50. To the extent present, any other of Campbell's medical and mental health concerns (other than GD) are well-controlled. (Levine Decl. I ¶ 3, Ex. A at 8–10; Oriel Decl. I ¶ 3, Ex. A at 17.)

51. Campbell has been living in a gender role (female) that is congruent with her gender identity (female) for at least 12 consecutive months. (Schmidt Dep. 48:25–50:6; *see also* Campbell Decl. ¶¶ 5, 7, 12, 31–35, 40–42.)

52. Campbell has made numerous requests to DOC personnel for further treatment for her GD beyond hormone therapy, most notably SRS. (*See* Campbell Decl. ¶ 45.)

53. In September 2013, Campbell first requested SRS in a "Psychological Services Request," but the treatment was denied. (Campbell Decl. ¶¶ 46–47; Benrud Decl. ¶ 17, Ex. 15.)

54. The next day, Campbell repeated her request in an "Interview/Information Request" slip to a deputy warden. (Campbell Decl. ¶ 48; Benrud Decl. ¶ 16, Ex. 14.)

55. In response, a deputy warden wrote: "No, we will not be providing [SRS]. Per [Division of Adult Institutions] policy, this surgery is not going to be approved state-wide due to the inability of inmates to live a "real-life" experience[.]" (Campbell Decl. ¶ 49; Benrud Decl. ¶ 16, Ex. 14.)

56. Campbell then requested SRS in two letters to Defendant Kallas and the DOC's Gender Dysphoria Committee ("GD Committee"). (Campbell Decl. ¶¶ 50–51; Benrud Decl. ¶ 18, Ex. 16.)

57. In May 2014, the DOC's GD consultant, Cynthia Osborne, evaluated Campbell to determine whether she was a candidate for SRS. (Benrud Decl. ¶ 12, Ex. 10 at PSU Records 000564; Campbell Decl. ¶ 52.)

58. During that evaluation, Campbell told Osborne about her continuing GD symptoms and suicidal thoughts. (Osborne Dep. 133:8–13; Campbell Decl. ¶ 53.)

59. Campbell also told Osborne that if she could not get SRS, then she would, out of necessity, perform the surgery on herself or commit suicide. (Campbell Decl. ¶ 54.)

60. After this evaluation, Osborne prepared a report documenting how Campbell continued to experience severe distress resulting directly from the incongruity between her male sex characteristics and her female gender identity *even after* taking feminizing hormones. (Benrud Decl. ¶ 12, Ex. 10 at PSU Records 000576–77.)

61. Osborne concluded that "[g]iven the chronicity and severity of his dysphoria, the tenacity of his desire to transition to full female identity, and his length of sentence, it is unlikely that his dysphoria will remit without SRS or other feminizing interventions." (Benrud Decl. ¶ 12, Ex. 10 at PSU Records 000591.)

62. Based on Osborne's report, Campbell wrote a letter to the GD Committee in September 2014, again requesting SRS. (Campbell Decl. ¶ 55; Benrud Decl. ¶ 18, Ex. 16.)

63. On October 23, 2014, Defendant Kallas, on behalf of the GD Committee, sent a reply letter stating that the GD Committee had denied Campbell's request for SRS. (Benrud Decl. ¶ 18, Ex. 16.)

64. As of October 2014, the GD Committee included Defendants Kallas, Greer, Holzmacher, Ankarlo, and Muse. (Benrud Decl. ¶ 3, Ex. 1, at Resp. to Interrog. No. 2.)

65. The DOC psychiatry director as of October 2014, Hugh Johnston, was also a member of the GD Committee; Defendant Anders has since replaced Johnston as both psychiatry director and on the GD Committee. (Anders Dep. 16:8–16, 42:20–24; Benrud Decl. ¶ 3, Ex. 1 at Resp. to Interrog. No. 2.)

66. Betsy Luxford joined the GD Committee in October 2014. (Benrud Decl. ¶ 3, Ex. 1 at Resp. to Interrog. No. 2.)

67. In March 2015, Campbell wrote another letter to the GD Committee restating her SRS request (and inquiring about additional treatments). (Campbell Decl. ¶ 57; *see* Benrud Decl. ¶ 19, Ex. 17.)

68. The next month, Defendant Kallas again denied the request. (Benrud Decl. ¶ 19, Ex. 17.)

69. Frustrated with the GD Committee's repeated denials, Campbell filed four "Offender Complaints" between March and May 2015. (Deposition of Cindy O'Donnell ("O'Donnell Dep.") Oct. 12, 2017, 32:18–37:18, 38:24–39:20, ECF No. 59; Campbell Decl. ¶ 59; *see* Benrud Decl. ¶¶ 20–23, Ex. 18 at DEFS' RESP TO RPOD 000127–28, 000130, Ex. 19 at DEFS' RESP TO RPOD 000140–45, Ex. 20 at DEFS' RESP TO RPOD 000155–58, and Ex. 21 at DEFS' RESP TO RPOD 000168–71.)

70. Among other things, these complaints challenged the Defendants' decisions to deny SRS. (Campbell Decl. ¶ 60; Benrud Decl. ¶¶ 20–23, Ex. 18 at DEFS' RESP TO RPOD 000127–28, 000130, Ex. 19 at DEFS' RESP TO RPOD 000140–45, Ex. 20 at DEFS' RESP TO RPOD 000155–58, and Ex. 21 at DEFS' RESP TO RPOD 000168–71.)

71. Campbell appealed these complaints all the way to the Office of the Secretary of the DOC. (O'Donnell Dep. 37:8–39:11; Benrud Decl. ¶¶ 20–23, Ex. 18 at DEFS' RESP TO RPOD 000119–21, Ex. 19 at DEFS' RESP TO RPOD 000135–36, Ex. 20 at DEFS' RESP TO RPOD 000150–51, and Ex. 21, at DEFS' RESP TO RPOD 000163–64.)

72. Defendant O'Donnell is the policy initiatives advisor in the Office of the Secretary of the DOC. (O'Donnell Dep. 13:10–23, 28:17–23.)

73. In her role as policy initiatives advisor in the Office of the Secretary of the DOC, O'Donnell issues decisions on inmate complaint appeals. (*Id.* 28:22–23.)

74. Once an inmate complaint appeal reaches her level, O'Donnell's decision is final, "the administrative remedies available to that offender are done[,]" and "[t]here's no other appeal beyond that." (O'Donnell Dep. 28:24–29:6, 35:2–4, 40:12–20; *see also* Kallas Dep. 190:3–13, 191:4–12.)

75. In 2015, O'Donnell dismissed all four of Campbell's complaint appeals, thereby issuing a final decision to deny Campbell SRS. (O'Donnell Dep. 37:23–38:3, 39:3–11, 39:15–20; Benrud Decl. ¶¶ 20–21, Ex. 18 at DEFS' RESP TO RPOD 000119–21 and Ex. 19 at DEFS' RESP TO RPOD 000135–36.)

**IV.     The DOC's policy and the Defendants' practices regarding SRS**

76. The DOC – Division of Adult Institutions Policy 500.70.27 (the "Policy") dictates policies and procedures for treating inmates with GD. (*See* Benrud Decl. ¶ 11, Ex. 9 at DEFS 003199–208.)

77. The Policy has gone through several revisions, but the material parts have remained the same. The current version went into effect on November 1, 2017. (*Id.* ¶ 11, Ex. 9.) Other operative versions at relevant times include those that went into effect on April 16, 2014, (*Id.* ¶ 9, Ex. 7), and on March 4, 2015, (*Id.* ¶ 10, Ex. 8). Other earlier versions include December 19, 2011, (*Id.* ¶ 6, Ex. 4), March 4, 2013, (*Id.* ¶ 7, Ex. 5), and May 30, 2013, (*Id.* ¶ 8, Ex. 6).

78. Defendant Kallas has played a primary role in developing and updating the Policy. (Ankarlo Dep. 48:21–49:3; Jess Dep. 63:6–64:3; Kallas Dep. 124:21–125:6, 134:15–136:2.)

79. Defendant Jess, in her official capacity, approved several versions of the Policy. (Jess Dep. 63:6–64:3, 73:3–5; Benrud Decl. ¶¶ 6–10, Exs. 4–8.)

80. Multiple other Defendants appear to have also signed versions of the Policy. (*See* Benrud Decl. ¶¶ 6–11, Ex. 4 at DEFS' RESP TO RPOD 000795, Ex. 5 at DEFS' RESP TO

11

RPOD 000802, Ex. 6 at DEFS' RESP TO RPOD 000809, Ex. 7 at DEFS' RESP TO RPOD 000817, Ex. 8 at DEFS' RESP TO RPOD 000825, and Ex. 9 at DEFS 003206.)

81. All of the Defendants have been or currently are members of the GD Committee, except for Jess and O'Donnell. (*See* Benrud Decl. ¶ 3, Ex. 1 at Resp. to Interrog. No. 2.)

82. The 2017 version of the Policy changed the name of the "GD Committee" to the "Transgender Committee." (*Id.* ¶ 11, Ex. 9 at DEFS 003205.)

83. The Policy defines real-life experience as:

> The act of fully adopting a new gender role in everyday life, allowing an individual to experience and test the consequences of the new gender role in the areas of employment, housing, education, and relationships with friends, family and significant others. The experience allows for a range of different life experiences and events that may occur throughout the year (e.g., family events, holidays, vacations, season-specific work or school experiences). During this time, individuals present consistently, on a day-to-day basis and across all settings of life, in their desired gender role. The real life experience tests the individual's resolve, the capacity to function in the preferred gender, and the adequacy of social, economic, legal and psychological supports.

(*Id.* ¶¶ 9–11, Ex. 7 at DEFS' RESP TO RPOD 000812, Ex. 8 at DEFS' RESP TO RPOD 000820, and Ex. 9 at 2017 at DEFS 003200.)

84. Determining whether a person with GD has completed a real-life experience is the subject of individualized medical judgment. (Schmidt Dep. 139:1–11; Levine Decl. I ¶ 3, Ex. A at 10–11; Oriel Decl. I ¶ 3, Ex. A at 14–16.)

85. The Defendants believe that before becoming eligible for SRS, an individual must complete at least 12 months of a real-life experience as a necessary prerequisite. (Greer Dep. 49:8–10; Kallas Dep. 67:4–18.)

86. This view—that to be eligible for SRS, an individual must complete at least 12 months of a real-life experience—appears to be falling out of favor among GD specialists.

12

(Levine Decl. I ¶ 3, Ex. A at 10–11; Oriel Decl. I ¶ 3, Ex. A at 14–16; *see* Benrud Decl. ¶ 12, Ex. 10 at PSU Records 000590.)

87. The Policy provides that "[d]ue to the limitations inherent in being incarcerated, a real-life experience for the purpose of gender-reassignment therapy is not possible for inmates who reside within a correctional facility." (Benrud Decl. ¶¶ 9–11, Ex. 7 at DEFS' RESP TO RPOD 000813 (§ II.B), Ex. 8 at DEFS' RESP TO RPOD 000821 (§ II.B), and Ex. 9 at DEFS 003205 (§ IV.D.7).)

88. This Policy language quoted in PFOF ¶ 87 prevents a qualified healthcare provider from exercising individualized medical judgment to determine whether an inmate has completed a real-life experience. It dictates for such a provider what he or she would normally determine by applying individualized medical judgment and clinical expertise. (*See* Schmidt Dep. 139:1–11; Levine Decl. I ¶ 3, Ex. A at 10–11; Oriel Decl. I ¶ 3, Ex. A at 14–16.)

89. Other than the Policy, no DOC policy prohibits prison healthcare providers from providing inmates with medically necessary treatment. (*See* Kallas Dep. 50:21–51:1.)

90. According to Defendant Greer, "we're not doing [SRS] in our system." (Greer Dep. 47:2–13.) And when asked if he could "think of any circumstances where an inmate should receive SRS," Greer responded, "I cannot." (*Id.* at 48:7–11.)

91. Defendant O'Donnell interprets the Policy to mean that SRS is not possible in prison. (O'Donnell Dep. 26:23–25, 38:21–23.)

92. Defendant Hable's understanding is that the DOC "do[es] not provide SRS." (Deposition of Robert Hable ("Hable Dep.") Oct. 13, 2017, 31:17–20, ECF No. 53; *see also id.* at 27:7–10.) He also thinks SRS is a "waste of taxpayers' money . . . ." (Hable Dep. 30:9–12, 31:2–15.)

93. Defendant Anders understands that the DOC does not allow SRS for any inmate. (Anders Dep. 49:4–16, 50:5–15.) According to Anders, Defendant Kallas told him that the DOC will not approve SRS. (*Id.* 49:4–16.)

94. Defendant Kallas testified at trial in the *Fields I* litigation that he supported a blanket ban on SRS for all inmates. (Kallas Dep. 45:17–46:9; Benrud Decl. ¶ 14, Ex. 12 at 200:16–201:1.)

95. When asked at trial in the *Fields I* litigation if he was "comfortable with that policy of not allowing reassignment surgery for individuals with gender identity dysphoria[,]" Defendant Kallas responded, "Yes." (Benrud Decl. ¶ 14, Ex. 12 at 200:23–201:1.)

96. While Defendant Kallas backtracked from his position in PFOF ¶¶ 94–95 in his deposition in this case, (Kallas Dep. 128:6–18), he still maintains that completing a real-life experience is necessary before SRS, (*Id.* 67:4–18).

97. No DOC inmate has ever received SRS. (Ankarlo Dep. 43:23–25; Kallas Dep. 133:18–134:2.)

98. Some Defendants maintain that the Policy does allow for SRS. (*See* Kallas Dep. 174:19–175:3.)

99. The Defendants argue that the Policy is not a blanket ban on SRS because it permits SRS in the following scenario:

> Q. Under what set of facts would the [P]olicy allow for [SRS]?
>
> A. I can think of one clear scenario, and that would be an inmate who had the equivalent of a real-life scenario prior to being incarcerated, where we could verify that and feel confident that it was a valid, significant, robust experience.

(*Id.* 174:19–25.)

100. The Policy provides that GD inmates shall have access to psychological treatment, psychiatric treatment, certain hormonal treatment, and "[o]ther treatment and

accommodations, although limited to those determined to be medically necessary by the GD Committee." (Benrud Decl. ¶¶ 9–11, Ex. 7 at DEFS' RESP TO RPOD 000813 (§ II), Ex. 8 at DEFS' RESP TO RPOD 000821 (§ II), and Ex. 9 at DEFS 003203 (§ IV.B).)

101. The Policy further provides that the GD Committee "[s]hall make recommendations as needed regarding diagnosis, treatment, management issues, and accommodations." (Benrud Decl. ¶¶ 9–11, Ex. 7 at DEFS' RESP TO RPOD 000812–13 (§ I.D), Ex. 8 at DEFS' RESP TO RPOD 000821 (§ I.C), and Ex. 9 at DEFS 003205 (§ V.D); Greer Dep. 31:19–32:6; Kallas Dep. 114:15–19.)

102. The GD Committee relies on the Policy when making decisions regarding treatment. (Ankarlo Dep. 49:21–50:3; Kallas Dep. 139:22–25; *see also* Greer Dep. 60:17–20, 62:14–16.)

103. The GD Committee "do[es] everything [it] can to follow the [P]olicy." (Ankarlo Dep. 50:1–3.)

104. Defendant Kallas specifically confirmed that the GD Committee relied on the Policy when it denied SRS for Campbell:

> Q. In making the decision that's referenced in the October 23rd[, 2014] letter, did the GD committee take policy 500.70.27 into account?
>
> A. Yes, that would be -- that would have been part of the determination.

(Kallas Dep. 179:15–19.)

105. Defendant Greer, a GD Committee member, also serves as the director of the DOC Bureau of Health Services. (Greer Dep. 17:7–23; Benrud Decl. ¶ 3, Ex. 1 at Resp. to Interrog. No. 2.)

15

106. As the director of the DOC Bureau of Health Services, Defendant Greer "oversee[s] all of the health care policies, services, [and] direction" in the DOC. (Greer Dep. 17:9–11.)

107. Under the Policy, Defendant Greer "has the authority and responsibility to determine what constitutes the inmate's necessary medical care." (Benrud Decl. ¶¶ 9–11, Ex. 7 at DEFS' RESP TO RPOD 000815 (§ V.F), 8 at DEFS' RESP TO RPOD 000823 (§ V.F), and 9 at DEFS 003205 (§ IV.D.5)].)

108. Defendant Greer agreed with the decision communicated in the October 23, 2014 letter. (Greer Dep. 72:1–3.)

109. When making decisions on inmate complaint appeals, O'Donnell consults the Policy. (O'Donnell Dep. 26:3–13.)

110. O'Donnell has no medical background, no medical training, and no experience with transgender care. (*See id.* 11:12–21, 40:12–41:3.)

111. In reviewing and deciding Campbell's complaints, O'Donnell did not review Campbell's medical record or consult anyone else with experience treating Campbell. (*See id.* 27:9–14.)

112. Other than the Policy, no DOC policy exists prohibiting medically necessary vaginoplasty for either biologic females or non-transgender inmates. (*See* Kallas Dep. 50:21–51:1; *see also* Greer Dep. 66:4–9; Deposition of Ryan Holzmacher ("Holzmacher Dep.") Oct. 9, 2017, 42:25–43:5, ECF No. 54; Kallas Dep. 141:12–18.)

113. The WPATH Standards of Care list criteria separately for each type of genital or breast surgery. (Benrud Decl. ¶ 13, Ex. 11 at 58–61.)

Dated this 9th day of February, 2018.

                                                HUSCH BLACKWELL LLP
                                                Attorneys for Plaintiff

                                     By:   *s/ Natalia S. Kruse*
                                                    Thomas P. Heneghan
                                                    Iana A. Vladimirova
                                                    Natalia S. Kruse
                                                    Joseph S. Diedrich

<u>P.O. ADDRESS</u>:
33 E. Main Street, Suite 300
P.O. Box 1379
Madison, Wisconsin 53701-1379
608.255.4440
608.258.7138 (fax)
Tom.Heneghan@huschblackwell.com
Iana.Vladimirova@huschblackwell.com
Natalia.Kruse@huschblackwell.com
Joseph.Diedrich@huschblackwell.com

MIL-29063830-1