IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARK A. CAMPBELL,
also known as NICOLE ROSE CAMPBELL,

        Plaintiff,

    v.

KEVIN KALLAS, RYAN HOLZMACHER,
JAMES GREER, GARY ANKARLO, JEFF
ANDERS,
MARY MUSE, MARK WEISGERBER,
ROBERT HABLE, CATHY A. JESS, and
CINDY O'DONNELL,

        Defendants.

OPINION & ORDER

16-cv-261-jdp

Plaintiff Mark A. Campbell, who goes by Nicole Rose Campbell, is a transgender female inmate in the custody of the Wisconsin Department of Corrections (DOC). She suffers from gender dysphoria and has received some treatment for this malady while incarcerated, including hormonal therapy. She has requested additional treatment: access to light makeup, electrolysis, and most important, sex reassignment surgery. Defendants, DOC officials, have denied her requests, explaining that electrolysis and makeup are not permitted within the male institutions where Campbell has been housed and that Campbell cannot obtain sex reassignment surgery until she experiences 12 continuous months of "living as a woman," which she cannot do as long as she is incarcerated.

Campbell, through counsel, claims that defendants have violated her constitutional rights under the Eighth and Fourteenth Amendments by denying her effective medical

treatment that is available to cisgender female inmates.[1] The parties have filed cross-motions for summary judgment. Dkt. 77 and Dkt. 79. I will grant each motion in part. But the parties have genuine disputes of material fact concerning whether sex reassignment surgery is medically necessary for Campbell. Campbell's Eighth Amendment deliberate indifference claims will proceed to trial.

## UNDISPUTED FACTS

The following facts are undisputed, except where noted.

Campbell has been a prisoner in the custody of the DOC since 2008. She is currently housed at the Racine Correctional Institution (RCI). She is scheduled to be released from prison in 2041.

Campbell is a transgender woman. She was born with male genitals and thus was assigned the male gender, but she identifies as female. She has been diagnosed with severe gender dysphoria, which "refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013). I'll discuss gender dysphoria treatment broadly before turning to Campbell's individual treatment, which is the focus of this lawsuit.

### A. WPATH standards of care for gender dysphoria

The World Professional Association for Transgender Health (WPATH) describes itself as "an international, multidisciplinary, professional association" concerned with "evidence-

---

[1] Cisgender individuals are those whose gender identity corresponds to their sex at birth. *See Cisgender, Oxford English Dictionary* (3d ed. 2015).

based care, education, research, advocacy, public policy, and respect for transgender health." World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconfirming People* 1 (7th version).[2] WPATH has developed what the parties agree are recognized as the authoritative standards of care for treating gender dysphoria. *See id.* The WPATH standards list several possible treatments for gender dysphoria, including counseling, hormone therapy, hair removal, voice therapy, and surgical treatment. The standards guide treatment decisions by recommending "flexible clinical guidelines" that a patient should meet before receiving some types of treatment, which are called "criteria." *Id.* at 2. The criteria for hormone therapy are:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country . . . ;

4. If significant medical or mental health concerns are present, they must be reasonably well-controlled.

*Id.* at 34. The criteria for breast augmentation surgery are identical. *See id.* at 59. The criteria for orchiectomy[3] add a fifth criterion of "12 continuous months of hormone therapy" prior to surgery. *Id.* at 60. The criteria for vaginoplasty[4] add a sixth criterion of "12 continuous months of living in a gender role that is congruent with [the patient's] gender identity." *Id.* at 61.

---

[2] *Available at* https://www.wpath.org/media/cms/Documents/Web Transfer/SOC/Standards of Care V7 - 2011 WPATH.pdf.

[3] An orchiectomy is the surgical removal of the testes and spermatic cord.

[4] Vaginoplasty generally refers to plastic surgery of the vagina, but here, it refers to creation of a new vagina, usually from penile tissue after a penectomy (surgical removal of the penis). *See id.* at 20. This category of surgery is often called "sex reassignment surgery" or "gender confirmation surgery."

The WPATH standards explain that this final criterion, which is often called "real-life experience," is meant to provide an opportunity for one to experience life in one's desired gender role "before undergoing irreversible surgery." *Id.* WPATH explains that "[c]hanging gender role can have profound personal and social consequences, and the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role." *Id.* The expectation is that during the 12-month period, "patients should present consistently, on a day-to-day basis and across all settings of life, in their desired gender role." *Id.*

The WPATH standards explicitly state that they apply "in their entirety" to institutionalized transgender individuals, including inmates. *Id.* at 67. They discuss the treatment of gender dysphoria within institutions in more detail:

> All elements of assessment and treatment as described in the [standards] can be provided to people living in institutions. Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. . . .
>
> . . . .
>
> Reasonable accommodations to the institutional environment can be made in the delivery of care consistent with the [standards], if such accommodations do not jeopardize the delivery of medically necessary care to people with gender dysphoria. . . . Denial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations under the [standards].

*Id.* at 67–68 (citation omitted). The WPATH standards also explain that clinical departures from the criteria may be justified by "a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common

situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm reduction strategies." *Id.* at 2.

## B. The DOC's gender dysphoria policy

The DOC has promulgated its own policy for treating gender dysphoria and accommodating transgender inmates. Defendant Cathy A. Jess, the deputy secretary of the DOC, has approved several versions of the policy.

The policy provides for a gender dysphoria committee (also known as the "transgender committee"), a group that interprets and develops the DOC's policy on treating inmates with gender dysphoria and reviews inmate requests for specific services and treatments. Defendants Kevin Kallas, Ryan Holzmacher, James Greer, Gary Ankarlo, Jeff Anders, Mary Muse, Mark Weisgerber, and Robert Hable are all past or current members of the committee. (Defendant Cindy O'Donnell is a designee of the DOC secretary.)

The policy also requires that inmates diagnosed with gender dysphoria

> have access to clinically appropriate treatment options that may include:
>
> 1. Psychological treatment that addresses ambivalence and/or dysphoria regarding gender and assists in better adjustment to incarceration.
>
> 2. Appropriate psychiatric care.
>
> 3. Hormonal treatment, in the circumstances described below.
>
> 4. Other treatment determined to be medically necessary by the Transgender Committee.

Dkt. 75-9, at 6. And it establishes a procedure to be followed when an inmate requests hormonal therapy or surgical treatment:

1. Health care staff who receive an initial request from an inmate for hormonal therapy or surgical procedures shall forward the request to the PSU [psychological services unit] Supervisor.

2. The PSU Supervisor shall assign a member of the PSU staff to conduct an initial evaluation to help determine whether a GD [gender dysphoria] diagnosis is appropriate and whether a more specialized evaluation from a GD consultant is needed. . . .

3. The PSU staff member shall submit his/her report to the Mental Health Director, who shall review the PSU report and determine whether a GD consultant is needed for any of the following:

    a. Telephone consultation.

    b. Review of the health care record.

    c. A more comprehensive in-person evaluation.

4. If a GD consultant conducts an in-person evaluation of a potential GD inmate, he/she shall forward a written report with treatment recommendations to the Mental Health Director for review. For any affirmative recommendations for hormone therapy or other medical interventions, the Mental Health Director shall review the report with the Transgender Committee for approval by the Committee. The Mental Health Director shall approve or deny the recommendations.

5. Recommendations from the GD consultant are not binding on the DOC; the Bureau of Health Services has the authority and responsibility to determine what constitutes an inmate's necessary medical care.

6. If new information becomes available that would significantly affect an earlier recommendation (e.g. prior treatment records become available), the Mental Health Director may request a new evaluation or reconsider prior treatment decisions.

7. Due to the limitations inherent in being incarcerated, a real-life experience for the purpose of gender-reassignment therapy is not possible for inmates who reside within a correctional facility. However, treatment and

accommodations may be provided to lessen gender dysphoria.

*Id.* at 7–8.

## C. Campbell's gender dysphoria treatment

In 2012, Cynthia Osborne, a gender dysphoria consultant engaged by the DOC, evaluated Campbell and forwarded a report to Kallas, the DOC mental health director, as called for by the DOC gender dysphoria policy. The 2012 report expresses "no doubt" that Campbell suffers from gender dysphoria, but it explains that "sex reassignment surgery is wholly contraindicated at this time and in the foreseeable future" because Campbell has other significant mental health conditions (most notably depression), "has a poor understanding of what is required of an individual who chooses to make a full, or even partial, cross-gender identity transition in the real world, . . . has never lived in a full-time role as a female in the community[, and] will not be able to do [so] in the restrictive environment of incarceration." Dkt. 74, at 30. Osborne recommended "only reversible interventions," including hormone therapy, counseling, and "feminizing allowances" such as access to feminine clothing and makeup. *Id.* She stated that her "best estimate" was that Campbell would "benefit significantly from hormone therapy." *Id.* at 19. Later that year, Campbell began hormone therapy. She also began receiving mental health services and was allowed to wear feminine clothing and glasses and use feminine bath products, such as scented body wash and deodorant.

In September 2013, Campbell wrote to a deputy warden, citing recent court opinions concerning inmates' access to sex reassignment surgery and asking "if this institution will provide this surgery." Dkt. 75-14, at 2. The deputy warden responded,

> No, we will not be providing this surgery. Per DAI [Division of Adult Institutions] policy, this surgery is not going to be approved

> statewide due to the inability of inmates to live a "real-life" experience.

*Id.*

Around the same time, Campbell's request for sex reassignment surgery was forwarded to the DOC's gender dysphoria committee. The committee denied Campbell's request. In a September 25 letter, Kallas listed two reasons for the denial. First, Kallas pointed to Osborne's 2012 report, which "stated that surgical interventions were contraindicated for" Campbell. Dkt. 75-15, at 2. Second, Kallas explained that there is an "inherent difficulty for any inmate to meet eligibility requirements for gender reassignment surgery while in prison—specifically, the need for a valid real-life experience in the desired gender role." *Id.* Campbell kept sending requests for sex reassignment surgery to Kallas and the committee. In May 2014, Kallas asked Osborne to evaluate Campbell again. Osborne did so.

In an August 2014 report, Osborne confirmed that Campbell's gender dysphoria diagnosis is "indisputable" and that the symptoms have been "consistent" and "severe." Dkt. 75-10, at 13, 14. She then discussed several factors pertaining to the decision to undergo sex reassignment surgery, including the WPATH criteria for vaginoplasty. She noted that Campbell's "desire to identify as female was compelling enough prior to [her] incarceration that [she] was pursuing" sex reassignment surgery on her own, and concluded that "Campbell may be a candidate for" sex reassignment surgery based on "the persistent presence of severe anatomic dysphoria." *Id.* at 15.

Osborne noted only "two potential contraindications" to sex reassignment surgery. *Id.* at 28. First, Campbell's hormonal treatment was not yet "optimized." Once it was, Campbell might "be an appropriate candidate for" sex reassignment surgery. *Id.* at 27. Second, a real-life experience "as understood by most community experts and lived by most community patients

is not possible in an incarcerated setting." *Id.* at 28. Because "[h]ousing decisions are necessarily based on a strictly binary understanding of gender—male and female—defined primarily by an inmate's external genitalia," it "would be entirely unfeasible in most situations" to place a transgender female inmate in a female institution before sex reassignment surgery. *Id.* at 24. But Osborne noted,

> [T]here is a lack of evidence that the RLE [real-life experience] is predictive of better outcomes [and] departures from the RLE standard are sometimes made in the community and may be justifiable in rare circumstances in correctional settings, [such as cases] where inmates have very long or life sentences, unambiguously severe anatomic dysphoria, well-managed comorbid conditions, a history of treatment compliance and cooperative relationships with providers, who demonstrate an understanding of the risks and can give informed consent, and for whom alternatives have been thoroughly considered, attempted or ruled out.

*Id.* at 28. She concluded,

> Campbell represents a case where the potential benefits may outweigh the risks.
>
> . . . .
>
> When maximum benefits from cross-sex hormones have been achieved, if the inmate remains stable, and if and when a safe and reasonable approach to resolving the RLE conundrum is determined, inmate Campbell may be an appropriate candidate for SRS [sex reassignment surgery]. If the DOC determines that SRS is not feasible, then I recommend that additional accommodations be considered that may further reduce the inmate's dysphoria and support [her] in [her] process of transition by affording [her] more opportunities and mechanisms to express and consolidate a feminine identity.

*Id.* at 29.

In September 2014, Campbell wrote to Kallas again, asking "whether the GD Committee would provide [her] with a real-life experience or approve [her] for gender reassignment surgery." Dkt. 75-16, at 2. Kallas responded on October 23, 2014:

> [T]he DOC is continuing to look at how we can provide at least some elements of a real-life experience to inmates by expanding allowable property. . . . However, providing a true or full real life experience that will help to determine future suitability for surgical interventions remains problematic in an incarcerated setting. . . . As such, the GD Committee has not approved your request for surgical intervention at this time. This determination may be revisited at a future date as our policies and approach evolve.

*Id.*

In November 2014, Campbell's hormone dosage levels were "optimized," and Campbell has maintained optimal hormonal therapy since then. Dkt. 91, ¶ 9.

In March 2015, Campbell wrote again, reiterating her request for sex reassignment surgery. She also asked for electrolysis and makeup, among other accommodations. In an April 27, 2015 letter, Kallas explained that the gender dysphoria committee's response concerning sex reassignment surgery was "essentially the same is in October 2014" because "there are considerable limitations in what we can provide for a real-life experience in your current setting that would match your life in a post-surgical setting," citing Osborne's 2014 report. Dkt. 75-17, at 2. But, he said, the committee was "continuing to consider this issue carefully." *Id.* As for Campbell's other requests for accommodations, Kallas explained that electrolysis and makeup "are not currently permitted, and I don't anticipate that they will be available in the near future." *Id.*

Campbell next turned to the DOC's grievance system. She filed four grievances in March, April, and May 2015, complaining that the gender dysphoria committee refused to

approve sex reassignment surgery to Campbell despite Osborne's 2014 report. The grievances were denied, citing the committee's decision. Campbell appealed to the highest level, the Office of the Secretary of the DOC, where O'Donnell issued a final decision dismissing Campbell's grievances.

Campbell filed this lawsuit in April 2016, seeking a court order requiring the gender dysphoria committee to provide her with sex reassignment surgery, makeup, and electrolysis and seeking damages for the delay in treatment. I granted her leave to proceed on Eighth Amendment deliberate indifference claims against defendants and recruited counsel to represent her. Through counsel, she later amended her complaint to include Fourteenth Amendment equal protection claims, too.

According to Campbell, she still has "anxiety, stress, and dysphoria" concerning her male genitalia despite hormonal therapy, Dkt. 76, ¶ 43, and until she receives sex reassignment surgery, she will continue to suffer "extreme emotional distress, extreme anxiety, extreme mental anguish, and depression." Dkt. 75-19, at 7. On several occasions, she has said that she "will consider self-castration and commit suicide if unable to have" sex reassignment surgery. Dkt. 75-10, at 7.

## D. Professional opinions

In preparation for litigation, the parties consulted with several professionals with experience treating transgender individuals.

Campbell consulted two experts, each of whom evaluated her, diagnosed her, and opined on her eligibility for sex reassignment surgery. Campbell's first expert is Dr. Kathy Oriel, a family physician who has evaluated more than 500 people for consideration of medical and surgical treatment for gender dysphoria. Oriel has diagnosed Campbell with gender dysphoria.

*See* Dkt. 65-1. Oriel opines in her report that "Campbell continues to have severe distress despite some medical management of her gender dysphoria," and therefore, Oriel recommends sex reassignment surgery. *Id.* at 19. She states that she is "confident no physician with adequate expertise and experience in gender medicine would find otherwise." *Id.* According to Oriel, Campbell meets the criteria for sex reassignment surgery. She "question[s] whether a real life experience, or some similar concept, should be a requirement for gender confirmation surgery." *Id.* at 17. She explains that if it is a requirement, it must "take into account individual circumstances." *Id.* Campbell has lived as a woman for more than 12 months "to the extent she can" within the prison setting, and therefore she has completed a real life experience. *Id.* at 18. "[N]o reasonable, qualified health care provider could conclude otherwise," according to Oriel. *Id.* Oriel concludes that "the failure to provide [Campbell] with adequate medical care—most importantly gender confirmation surgery—has caused [her] to suffer unnecessarily. . . . Defendants' actions and inactions here run counter to the generally accepted standards and practices of those who specialize in treating transgender individuals." *Id.* at 20.

Campbell's second expert is Felicia Levine, a licensed clinical social worker, certified transgender care therapist, and member of WPATH. Levine agrees that Campbell "suffer[s] from severe, persistent gender dysphoria." Dkt. 63-1, at 9. Like Oriel, Levine believes that "Campbell meets the criteria for gender confirmation surgery." *Id.* at 12. And she agrees that "the necessity and value of a real-life experience is debatable and even doubtful" and that "a determination of whether an individual has achieved a real-life experience should be made on a case-by-case basis." *Id.* at 11, 13. She opines in her report that "any reasonable professional in [her] field would conclude that Ms. Campbell has achieved a real-life experience." *Id.* at 11. Levine concludes that "gender confirmation surgery is necessary and the only treatment that

will relieve Ms. Campbell of her severe, persistent gender dysphoria" and that the denial of this surgery "is at odds with the generally accepted standards of care [and is causing] unnecessary—and unnecessarily acute—suffering." *Id.* at 12, 13.

Defendants adduce depositions from two professionals. The first is Kevin Kallas, the DOC mental health director and a defendant in this lawsuit. Defendants don't hold Kallas out to be an expert. *See* Dkt. 49, at 3. Campbell challenges Kallas's ability to testify as an expert, given his admission that he is not a specialist in treating gender dysphoria. *See* Dkt. 90, ¶ 60. And Kallas hasn't evaluated Campbell personally. Those caveats aside, Kallas opines, based on his review of Osborne's reports and Campbell's psychological records, that there are "at least two issues" regarding Campbell's "suitability" for sex reassignment surgery: "the absence of the equivalent of a real-life experience [and Campbell's] ongoing personality-based vulnerabilities." Dkt. 56 (Kallas dep. 171:7–13).

Defendants' second professional is Dr. Chester Schmidt, a psychiatrist specializing in sexual disorders who has treated hundreds of people with gender dysphoria. Defendants list Schmidt as an expert, despite the lack of the usual expert report, and Campbell has not yet challenged Schmidt's ability to testify as an expert. Schmidt evaluated Campbell and diagnosed her with gender dysphoria, unspecified depressive disorder, and pedophilic disorder. Schmidt opines that sex reassignment surgery is not medically necessary for Campbell because it "is unlikely to cause any additional improvements in her functional capabilities within the prison setting for the remainder of her incarceration." Dkt. 61 (Schmidt dep. 120:9–12). He acknowledges that receiving sex reassignment surgery "might" reduce Campbell's risk of suicide, but he says her depression and suicidal ideation can be treated just like "any other prisoner . . . who's upset about confinement or any aspect of confinement that becomes

depressed and becomes suicidal" can be treated. *Id.* at 124:11–18. He explains that in his "professional experience" there are no contraindications to sex reassignment surgery for Campbell but that "institutionally," the inability to complete a real-life experience is a "contraindication." *Id.* at 120:23–121:19. I take Schmidt to mean that there are no medical reasons to deny sex reassignment surgery for Campbell but that the DOC's policy concerning inmates' inability to complete a real-life experience is a reason to deny sex reassignment surgery for Campbell. Schmidt has not offered an opinion on whether Campbell has completed a real-life experience. *Id.* at 140:12–15.

ANALYSIS

The parties have filed cross-motions for summary judgment. Defendants move for summary judgment in their favor on all of Campbell's claims; Campbell moves for partial summary judgment on several discrete issues—in her view, several factual issues remain to be decided at trial.

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, the parties have filed cross-motions for summary judgment, the court "look[s] to the burden of proof that each party would bear on an issue of trial [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If either party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment against that party is appropriate. *Mid. Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995)

(quoting *Tatlovich v. City of Superior*, 904 F.2d 1135, 1139 (7th Cir. 1990)). "As with any summary judgment motion, this [c]ourt reviews these cross-motions 'construing all facts, and drawing all reasonable inference from those facts, in favor of . . . the non-moving party.'" *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)).

## A. Campbell's summary judgment motion

Campbell moves for summary judgment in her favor on six discrete "parts of her claims." Dkt. 79, at 1. I will grant her motion on two of those issues, because defendants do not dispute them: (1) defendants acted under color of state law and (2) Campbell has a serious medical need. But I will deny her motion as to the remaining issues. The fourth issue, whether the DOC policy "discriminates on the basis of both sex and transgender status," *id.*, will be resolved in defendants' favor, as explained in the analysis below. The fifth and sixth issues, whether the WPATH standards are generally accepted standards of care for treating gender dysphoria and whether Campbell meets those standards, are genuinely disputed, as explained in the analysis below. And the third issue, whether defendant acted with deliberate indifference by enforcing the DOC policy "if sex reassignment surgery is medically necessary for Campbell," *id.*, need only be reached if those genuinely disputed issues are resolved in Campbell's favor. Making a determination on such an issue "would constitute an advisory opinion." *Extreme Networks, Inc. v. Enterasys Networks, Inc.*, 558 F. Supp. 2d 909, 911 (W.D. Wis. 2008), *vacated in part on other grounds*, 395 F. App'x 709 (Fed. Cir. 2010).

**B. Defendants' summary judgment motion**

**1. Denial of medical care**

Campbell contends that defendants are deliberately indifferent to her gender dysphoria, in violation of her Eighth Amendment right to be free from cruel and unusual punishment. To prevail on her claims, Campbell must show that she has a serious medical need, that defendants have been aware of that need, and that they have been deliberately indifferent to it. *Fields v. Smith*, 653 F.3d 550, 555–56 (7th Cir. 2011). Defendants concede that gender dysphoria is a serious medical need and that they have been aware of Campbell's gender dysphoria diagnosis. The sole question here is whether defendants have been deliberately indifferent to Campbell's gender dysphoria.

Courts "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Deliberate indifference is more than mere negligence; it is found only where "a medical professional's treatment decision [is] 'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" *Id.* at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996)). A "situation that might establish a departure from minimally competent medical judgment is where a prison official persists in a course of treatment known to be ineffective." *Id.* at 729–30; *accord Fields*, 653 F.3d at 556 ("Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture."). Thus, a prison official who knows that an inmate suffers from gender dysphoria but refuses to provide what they know to be an effective treatment for that disorder is deliberately indifferent to a serious medical need. *Fields*, 653 F.3d at 555–57.

Here, there is no dispute that sex reassignment surgery, electrolysis, and light makeup can effectively treat gender dysphoria in some patients. The pertinent issues are (1) whether they would be effective treatments for Campbell; and (2) whether Campbell's current treatment is ineffective. Campbell has adduced evidence that the answer to the two questions above is yes: several medical professionals opine that Campbell continues to suffer the negative symptoms of gender dysphoria under the current treatment regime, that she is a candidate for additional treatments, including sex reassignment surgery, and that those treatments would offer her unique relief. In other words, Campbell's current treatment is ineffective at fully addressing her gender dysphoria, and sex reassignment surgery, electrolysis, and light makeup would offer more effective treatment. So defendants' refusal to provide her sex reassignment surgery because of their refusal to allow her to live in a female institution pre-surgery is not a valid medical reason to deny her access to that treatment.

Defendants argue that Campbell cannot show deliberate indifference because her experts haven't explicitly stated that no minimally competent medical professional would deny these treatments to her. But the expert opinions Campbell adduces certainly fulfill the no-minimally-competent-professional standard, even if they don't use that exact phrase. Oriel opines: "My recommendation . . . is for gender confirmation surgery  . . . . I am confident no physician with adequate expertise and experience in gender medicine would find otherwise." Dkt. 65-1, at 19. And Levine opines: "It is my professional opinion and clinical recommendation . . . that gender confirmation surgery is necessary and the only treatment that will relieve Ms. Campbell of her severe, persistent gender dysphoria. Any reasonable therapist who specializes in transgender care in my field would agree." Dkt. 63-1, at 12. And although Oriel and Levine focus on sex reassignment surgery, it is clear from the context of their reports

that they believe that no minimally competent medical professional would deny Campbell other effective treatments, such as electrolysis and makeup, either. The real issue is whether Campbell has fulfilled, or should be required to fulfill, the real-life-experience criterion for sex reassignment surgery.

A real-life experience is not required for electrolysis and makeup, so based on Oriel, Levine, and Osborne's reports, there's no apparent medical reason to deny these effective treatments to Campbell. Although Campbell doesn't move for summary judgment on the electrolysis and makeup, there appears to be no genuine dispute that these are effective treatments for gender dysphoria, so I will give defendants notice under Rule 56(f) that I will consider granting summary judgment in Campbell's favor on these claims after giving defendants a chance to respond.

Defendants also argue that Campbell can't establish deliberate indifference because defendants' putative expert, Dr. Schmidt, has opined that sex reassignment surgery isn't medically necessary for Campbell. Under defendants' understanding of the no-minimally-competent-professional standard, dueling expert opinions concerning deliberate indifference do not create a dispute of fact, but rather conclusively establish a lack of deliberate indifference and require an automatic grant of summary judgment in defendants' favor. Under defendants' theory, Campbell could prevail only if defendants failed to adduce *any* expert opinion in support of their chosen course of treatment. But defendants' understanding conflicts with the basic standard of review at summary judgment: I must view the facts in the light most favorable to the nonmoving party. So "'where evidence exists that the defendant knew better than to make the medical decision that he did,' then summary judgment is improper and the claim should be submitted to a jury." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63

(7th Cir. 2016) (quoting *Petties*, 836 F.3d at 730–31). As discussed above, Campbell has adduced evidence sufficient to show deliberate indifference. Defendants' evidence to the contrary may create a dispute of fact, but it does not require or allow me to grant summary judgment in their favor on this claim.

Whether sex reassignment surgery is medically necessary for Campbell must be resolved at trial. Resolving this issue will also entail resolving these subsidiary issues: whether real-life experience is invariably a prerequisite to sex reassignment surgery; whether the real life experience can be adequately achieved in a prison setting; and, if some form of real-life experience is required, whether Campbell has completed it.

### 2. Denial of equal protection

Campbell also contends that defendants are violating her right to equal protection under the Fourteenth Amendment because the DOC's gender dysphoria policy denies her access to a vaginoplasty because of her sex and transgender status.

"To establish a prima facie case of discrimination under the equal protection clause, [Campbell must] show that [s]he is a member of a protected class, that [s]he is otherwise similarly situated to members of the unprotected class, and that [s]he was [intentionally] treated differently from members of the unprotected class." *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005) (quoting *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)). If she does so, I must inquire into the reason for the discrimination. The level of review I apply at this step depends on what protected class is at issue.

Campbell pursues two theories of discrimination. First, she contends that she is a biological male, that she is otherwise similarly situated to biological females, and that the DOC policy denies medically necessary vaginoplasty to biological males, but not biological females.

Second, she contends that she is a transgender inmate, that she is otherwise similarly situated to cisgender inmates, and that the DOC policy denies medically necessary vaginoplasty to transgender inmates, but not cisgender inmates.

Classification on the basis of sex triggers "heightened scrutiny," in which the burden rests on the state to show that the sex-based "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017), *cert. dismissed*, No. 17-301 (Mar. 5, 2018) (quoting *United States v. Virginia*, 518 U.S. 515, 524 (1996)). Neither the Seventh Circuit nor the Supreme Court has determined whether transgender status should be treated similarly. *See id.* I need not determine the answer, because even if I were to assume that classification on the basis of transgender status also triggers heightened scrutiny, Campbell's claim would fail.

Campbell argues that the DOC policy constitutes a "blanket ban" of medically necessary vaginoplasty for transgender inmates, whereas cisgender female inmates are not automatically barred from receiving medical necessary vaginoplasty. Dkt. 85, at 21. But that misstates the DOC policy, which requires an evaluation-and-review procedure and states that it is not possible to complete a real-life experience while in prison. So under the policy, an inmate who completed a real-life experience before incarceration and was otherwise eligible might receive sex reassignment surgery, including a vaginoplasty. The DOC policy, by its terms, is not a blanket ban on sex reassignment surgery.

"[The Supreme] Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Superior Court*, 450 U.S. 464, 469 (1981). This is one

such circumstance. A cisgender female inmate need not undergo a real-life experience or hormone therapy or have persistent, well-documented gender dysphoria before obtaining vaginoplasty because a vaginoplasty for a transgender female inmate (that is, a biological male) is necessarily a different type of surgical procedure than for a cisgender female inmate (that is, a biological female). The biological female already has a vagina; the biological male doesn't. The government has an interest in ensuring that inmates receive appropriate, effective medical treatment. Employing different decision-making policies for different types of medical procedures does not violate the Equal Protection Clause.

As discussed above, there are real issues regarding the real-life-experience requirement imposed by defendants. But those issues do not implicate the Equal Protection Clause. I will grant defendants' motion for summary judgment on Campbell's equal protection claims.

### 3. Qualified immunity

Finally, defendants contend that qualified immunity shields them from liability for monetary damages because their actions did not violate "clearly established constitutional or statutory rights." *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011).

"To be clearly established, a right must be sufficiently clear 'that every "reasonable official would have understood that what he is doing violates that right."'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011)). "Because the focus is on whether the [defendant] had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 2018 WL 1568126, at *2 (Apr. 2, 2018) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

Back in 2011, the Seventh Circuit explained that "[i]t is well established that the Constitution's ban on cruel and unusual punishment does not permit a state to deny effective treatment for the serious medical needs of prisoners" and held that gender dysphoria is a serious medical need. *Fields*, 653 F.3d at 556. Viewing the facts in the light most favorable to Campbell, defendants have denied her effective treatment for her serious medical need since 2014. Defendants had fair notice that denying effective treatment or a confirmed diagnosis of severe gender dysphoria would violate Campbell's rights under the Eighth Amendment.

Defendants argue for a more fact-specific analysis; the pertinent question, they say, is whether it is clearly established that denying sex reassignment surgery to a transgender inmate with gender dysphoria violates the Eighth Amendment. But that misstates Campbell's claims, which include other types of treatments. And as the Supreme Court has explained, there need not be "'a case directly on point' for a right to be clearly established." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). I will not grant summary judgment on defendants' qualified immunity defense, although defendants may assert the defense at trial.

CONCLUSION

I have identified two claims—regarding makeup and electrolysis—that may be resolved before trial through judgment independent of the motion. The claim concerning sex reassignment surgery will proceed to a bench trial.

Campbell has requested clarification of the pretrial deadlines. Dkt. 95. The final pretrial conference must be rescheduled to accommodate the court's calendar, so I will modify and clarify the schedule leading up to trial as follows:

Defendants' Rule 56(f) response must be filed with the court by Tuesday, May 22, 2018.

Any motions in limine, including *Daubert* motions, must be filed with the court by Tuesday, June 5, 2018.

Campbell's pretrial statement and each party's statement of proposed findings of fact, proposed special verdict, and responses to motions in limine must be filed by Tuesday, June 12. *See* Dkt. 30, at 38–39.

Each party must submit electronic copies of their trial exhibits to the clerk's office by Tuesday, June 12. *See id.* at 39.

The final pretrial conference will be held Tuesday, June 19, at 3 p.m.

Trial will begin Monday, June 25, at 9 a.m.

ORDER

IT IS ORDERED that:

1. Plaintiff Mark A. Campbell's motion for partial summary judgment, Dkt. 79, is GRANTED in part and DENIED in part, consistent with the opinion above.

2. Defendants' motion for summary judgment, Dkt. 77, is DENIED as to plaintiff's deliberate indifference claims and defendants' qualified immunity defense and GRANTED as to plaintiff's equal protection claims.

3. Defendants must respond to the court's Rule 56(f) notice on the electrolysis and makeup claims by May 22, 2018, showing why the court should not grant summary judgment against them on these claims.

4. The clerk of court is directed to reschedule the final pretrial conference to Tuesday, June 19, 2018, at 3 p.m.

Entered May 4, 2018.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge