In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 18-2075

MARK A. CAMPBELL,

*Plaintiff-Appellee,*

*v.*

KEVIN KALLAS, et al.,

*Defendants-Appellants.*

————————————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 16-cv-261-jdp — **James D. Peterson**, *Chief Judge.*

————————————

ARGUED OCTOBER 26, 2018 — DECIDED AUGUST 19, 2019

————————————

Before WOOD, *Chief Judge*, and SYKES and SCUDDER, *Circuit Judges*.

SYKES, *Circuit Judge*. Mark Campbell, also known as Nicole Rose Campbell, is an inmate in the Wisconsin prison system. In 2007 Campbell pleaded guilty to first-degree sexual assault of a child and is now serving a 34-year sentence. Campbell has been diagnosed with gender dysphoria; she is biologically male but identifies as female. Department

of Corrections ("DOC") medical staff are treating Campbell's condition with cross-gender hormone therapy.

Beginning in September 2013, Campbell repeatedly requested a more radical intervention: sex-reassignment surgery. National standards of care recommend that patients undertake one year of "real life" experience as a person of their self-identified gender before resorting to irreversible surgical options. That preparatory period presents challenges for officials charged with the administration of sex-segregated prisons. DOC officials consulted an outside expert, who determined that Campbell was a potential surgical candidate. But the expert's cautious conclusion was conditioned on DOC officials developing a safe, workable solution to the real-life-experience dilemma. Citing these concerns and DOC policy, officials denied Campbell's request.

After filing grievances and exhausting administrative appeals, Campbell sued Dr. Kevin Kallas, the DOC Mental Health Director, and a host of other prison officials under 42 U.S.C. § 1983. She alleged that the defendants were deliberately indifferent to her serious medical needs in violation of the Eighth Amendment and sought damages and injunctive relief. Both sides moved for summary judgment, and the defendants also claimed qualified immunity. The district court denied the motions. As relevant here, the judge rejected the claim of qualified immunity, concluding that caselaw clearly established a constitutional right to effective medical treatment.

We reverse. Qualified immunity shields a public official from suit for damages unless caselaw clearly puts him on notice that his action is unconstitutional. The judge's ap-

proach to the qualified-immunity question was far too general. The Eighth Amendment requires prison healthcare professionals to exercise medical judgment when making decisions about an inmate's treatment. And they cannot completely deny the care of a serious medical condition. But cases recognizing those broad principles could not have warned these defendants that treating an inmate's gender dysphoria with hormone therapy and deferring consideration of sex-reassignment surgery violates the Constitution. Moreover, it's doubtful that a prisoner can prove a case of deliberate indifference when, as here, prison officials followed accepted medical standards. The defendants are immune from damages liability.

## I.  Background

### A.  Standards of Care

Campbell suffers from gender dysphoria, an acute form of mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity. *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 451 (5th ed. 2013). To "provide clinical guidance for health professionals," the World Professional Association for Transgender Health established national standards of care for transsexual, transgender, and gender-nonconforming individuals. WORLD PROFESSIONAL ASS'N FOR TRANSGENDER HEALTH, STANDARDS OF CARE FOR THE HEALTH OF TRANSSEXUAL, TRANSGENDER, & GENDER NONCONFORMING PEOPLE 1 (7th version 2011) ("the *Standards*"), https://www.wpath.org/media/cms/Documents/SOC%20v7/ Standards%20of%20Care_V7%20Full%20Book_English.pdf. The parties cite the *Standards* extensively and treat them as

authoritative. "While flexible," these clinical guidelines "offer standards for promoting optimal health care." *Id.* at 2.

The *Standards* outline a range of treatment options for individuals with gender dysphoria. Patients may be encouraged to alter their "gender expression" by living continuously or part-time in another gender role. *Id.* at 9. Hormone therapy, which can "feminize or masculinize the body," is appropriate for some patients. *Id.* The *Standards* provide four criteria for hormone-therapy eligibility:

> 1. Persistent, well-documented gender dysphoria;
>
> 2. Capacity to make a fully informed decision and to consent for treatment;
>
> 3. Age of majority in a given country … ; [and]
>
> 4. If significant medical or mental health concerns are present, they must be reasonably well-controlled.

*Id.* at 34. Psychotherapy is not an "absolute" prerequisite for hormone therapy or surgery but is "highly recommended." *Id.* at 28.

Surgery is "the last and the most considered step in the treatment process," and not all gender-dysphoric patients are surgical candidates. *Id.* at 54. The *Standards* outline several surgical approaches. *Id.* at 57–61. Some modify secondary sex characteristics via breast reduction or augmentation, and facial- and voice-feminization surgery. *Id.* at 57. The *Standards* don't require hormonal interventions or extensive preparatory periods for these surgeries, though 12 months of feminizing hormone therapy is recommended

for male-to-female patients. *Id.* at 58–59. Surgeries altering a patient's reproductive organs carry stricter eligibility criteria. *Id.* at 59–61. A patient meets the criteria for a hysterectomy and ovariectomy (removal of the uterus and ovaries) or an orchiectomy (removal of the testicles) if he or she satisfies the hormone-therapy criteria and has completed a year of continuous hormone therapy. *Id.* at 60.

For operations commonly referred to as sex-reassignment surgeries—surgeries that replace an individual's existing genitals with approximations of those of the opposite sex—the *Standards* add yet another requirement. In addition to a year of hormone therapy, the *Standards* require patients to have "12 continuous months of living in a gender role that is congruent with their gender identity." *Id.* The World Professional Association for Transgender Health justifies this requirement by citing an "expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role[] before undergoing irreversible surgery." *Id.* at 60. The one-year preparatory period helps patients adjust to the "profound personal and social consequences" of adjusting one's gender expression. *Id.* at 61. The *Standards* don't include an exception to the real-life-experience requirement for patients living in institutional settings. *Id.* at 67–68. The World Professional Association for Transgender Health explicitly states that the *Standards* can be utilized effectively under those conditions. *Id.*

### B.  DOC Policies and Procedures

The DOC established policies to address the unique challenges posed by the incarceration of transgender inmates. The Gender Dysphoria Committee (the "Committee") is

charged with handling medical treatment and accommodation requests by an inmate with gender dysphoria. Several of the defendants are current and former committee members; Dr. Kallas serves as DOC Mental Health Director and chairs the Committee.

DOC Policy 500.70.27 lays out the protocol for transgender inmates. Wisconsin Department of Corrections, Division of Adult Institutions, Policy and Procedures, Policy No. 500.70.27 (Nov. 11, 2017) at Separate Appendix of Defendants–Appellants at 64–73, *Campbell v. Kallas*, No. 18-2075 (7th Cir. July 18, 2018), ECF No. 17. An inmate may self-identify as transgender at any point during his incarceration, making him eligible for several accommodations. *Id.* at 66. The inmate may order "clothing, shoes, undergarments[,] and prescription eyeglass frames … that correspond to the desired gender." *Id.* at 73. Undergarments matching the inmate's gender identity are also allowed, provided "they are not visible to others when leaving the cell" or worn in a "disruptive or provocative" manner. *Id.* Makeup is unavailable for an inmate in male facilities, but an inmate may purchase feminine shower products and request a hair-removal product. *Id.*

In addition to these lifestyle accommodations, the DOC offers several forms of medical treatment. Once an inmate self-identifies as transgender, prison medical staff or an outside consultant may assign a clinical diagnosis of gender dysphoria. *Id.* at 66. A clinically diagnosed inmate is entitled to appropriate psychological treatment, psychiatric care, hormone therapy (under certain circumstances), and "[o]ther treatment determined to be medically necessary by the Transgender Committee." *Id.* at 68.

Requests for new hormonal or surgical interventions are processed by a hierarchy of prison medical officials who review the inmate's condition. *Id.* at 69–70. When an inmate first requests hormone therapy or surgery, the Supervisor of the Psychological Services Unit is notified. *Id.* at 69. The Supervisor assigns a staff member to determine whether to diagnose the patient with gender dysphoria and whether a "more specialized evaluation" by a gender-dysphoria consultant is needed. *Id.* The Psychological Services Unit report is forwarded to the Mental Health Director, who may call in a gender-dysphoria consultant for further evaluation. *Id.* If the consultant recommends hormone therapy or surgery, the Director reviews the report. The consultant's recommendations are not binding and can either be approved or denied by the Director in consultation with the Committee. *Id.* at 69–70. Finally, the policy notes: "Due to the limitations inherent in being incarcerated, a real-life experience for the purpose of gender-reassignment therapy is not possible for inmates who reside within a correctional facility. However, treatment and accommodations may be provided to lessen gender dysphoria." *Id.* at 70.

**C. Campbell's Course of Treatment**

Campbell is currently incarcerated at the Racine Correctional Institution. Prior to her incarceration, she self-administered hormone treatments. Although she considered sex-reassignment surgery, she never discussed it with a physician.

Campbell raised gender-identity concerns with a prison psychologist in January 2012. The Committee hired Cynthia Osborne to evaluate Campbell. Osborne is a gender-dysphoria expert and has consulted on numerous cases for

prison systems around the country. In August 2012 Osborne diagnosed Campbell with gender dysphoria but stopped well short of recommending sex-reassignment surgery.

Osborne explained that the 12-month real-life experience required by the World Professional Association for Transgender Health could not be fully implemented in the prison setting. She noted that Campbell had "never had the opportunity to meaningfully consolidate [her] preferred female identity into a successful life" and would "not be able to do such consolidation in the restrictive environment of incarceration." Given that challenge, as well as Campbell's "comorbid psychiatric conditions and vulnerabilities," Osborne determined that "only reversible interventions should be considered" and that "[s]ex[-]reassignment surgery [was] wholly contraindicated." Osborne recommended hormone therapy, counseling, and "that the DOC consider what feminizing allowances might be made," even though "[s]uch accommodations are rarely if ever medically necessary."

The Committee adopted Osborne's recommendations, initiating hormone therapy and permitting Campbell to don feminine clothing and glasses and use feminine shower products. On September 5, 2013, Campbell submitted a request for sex-reassignment surgery. Dr. Kallas, following the Committee's recommendation, denied Campbell's request, citing Osborne's finding that "surgical interventions were contraindicated." Dr. Kallas explained that DOC "policy does not prohibit surgical intervention," but he and the Committee recognized "the inherent difficulty for any inmate to meet eligibility requirements for gender reassign-

ment surgery while in prison—specifically, the need for a valid real-life experience in the desired gender role."

Campbell continued to file surgery requests, and DOC officials again consulted with Osborne. She reviewed Campbell's file, talked with the treating psychologist, and met with Campbell face to face. On August 4, 2014, Osborne submitted her second report. Echoing themes from her first report, Osborne described the *Standards* as imperfect guides for treating gender dysphoria in prison. On the possibility of surgery, Osborne explained that given "the persistent presence of severe anatomic dysphoria[,] inmate Campbell may be a candidate for" sex reassignment. The length of Campbell's sentence and her track record of cooperating with medical personnel bolstered the case for surgery.

Turning to the "real life experience" requirement, Osborne explained that "[m]any gender dysphoria experts believe that the challenges of completing a valid real-life experience … in the context of incarceration present a formidable obstacle to" sex-reassignment surgery. She noted that "there is no empirical evidence on which the DOC can rely in its efforts to predict outcomes, prevent harm[,] and maintain safety" in developing a real-life experience for Campbell. Thus, the DOC's "[r]eluctance to embark on a social experiment" was "understandable and prudent." For inmates with lengthy sentences, however, Osborne questioned "whether the [real-life experience] as traditionally understood" should be required. Modifying or eliminating the requirement would carry risks for Campbell, but the DOC should undertake "an examination of the [real-life experience] concept in order to determine whether there is a workable approach for inmates." Still, given these challeng-

es, she concluded that "conservative approaches … for incarcerated individuals are wholly warranted."

Summarizing her conclusions, Osborne explained that Campbell had not undergone a valid real-life experience while incarcerated, despite Campbell's claim to the contrary. Departing from the requirement "may be justifiable in rare circumstances in correctional settings"—including Campbell's case. Osborne stated that Campbell could be a surgical candidate but conditioned her assessment on the DOC's development of "a safe and reasonable approach to resolving the [real-life experience] conundrum."

On September 29, 2014, Campbell filed another request seeking approval for a real-life experience and sex-reassignment surgery. Dr. Kallas responded on October 23, assuring Campbell that "the DOC is continuing to look at how we can provide at least some elements of a real-life experience." Nevertheless, "providing a true or full real-life experience that will help to determine future suitability for surgical interventions remain[ed] problematic in an incarcerated setting." Referring to Osborne's second report, Dr. Kallas, with the Committee's recommendation, denied Campbell's request. Campbell sent additional letters on March 15 and April 4, 2015, but Dr. Kallas again denied the requests for surgery citing the "considerable limitations in what [officials could] provide for a real-life experience." Dr. Kallas also rejected Campbell's request for electrolysis for hair removal and "light makeup," neither of which was "currently permitted" in the prison.

In the wake of these denials, Campbell filed four administrative grievances reiterating her arguments for sex-reassignment surgery, electrolysis, and makeup. All were

denied. In response to the electrolysis and makeup requests, DOC officials determined that "makeup is not a medically necessary accommodation" and "[a]lternatives to electrolysis" were readily available.

## D.  District-Court Proceedings

In April 2016 Campbell filed suit under 42 U.S.C. § 1983 alleging that DOC officials were deliberately indifferent to her serious medical needs in violation of the Eighth Amendment.[1] The suit seeks damages and injunctive relief ordering "necessary medical care, including [sex-reassignment surgery], and other appropriate treatment, including light makeup, electrolysis, breast augmentation, and voice therapy."

Both sides moved for summary judgment, introducing dueling expert opinions on Campbell's suitability for surgery. Dr. Kathy Oriel, one of Campbell's experts, determined that "no physician with adequate expertise and experience in gender medicine would" dispute Campbell's need for sex-reassignment surgery. Dr. Chester W. Schmidt, the defense expert, opined that sex-reassignment surgery was not medically necessary.

Campbell argued that because DOC officials "implemented and enforce[d] a blanket ban on medically necessary treatment … and applied it to Campbell," they "acted with deliberate indifference as a matter of law." The defendants sought qualified immunity, arguing that their treatment

---

[1] Campbell later amended her complaint to bring an equal-protection claim under the Fourteenth Amendment. That claim is not at issue in this appeal.

decisions were not a substantial departure from accepted professional judgment.

The district judge denied the motions for the most part. Because DOC officials knew about Campbell's gender dysphoria and admitted its status as a serious medical condition, the judge saw one key remaining question: whether sex-reassignment surgery was medically necessary. On that issue Dr. Oriel's expert testimony generated a factual dispute, so the judge held that "Campbell ha[d] adduced evidence sufficient to show deliberate indifference," precluding summary judgment. The medical necessity of sex-reassignment surgery in Campbell's case would be determined at a bench trial.

The judge also addressed Campbell's requests for electrolysis and makeup, articulating a preliminary determination that providing those accommodations "would offer more effective treatment" for Campbell's gender dysphoria and finding "no apparent medical reason to deny" them. But Campbell hadn't moved for summary judgment on those claims, so the judge gave the defendants notice and an opportunity to respond under Rule 56(f) of the Federal Rules of Civil Procedure. They replied with two arguments: First, a ruling on electrolysis and makeup prior to a ruling on surgery would be premature. Second, they cited the lack of record evidence that Campbell, "on an individualized basis, has a medical need for electrolysis and makeup." The judge postponed further consideration of the issue until trial.

The judge's discussion of qualified immunity was brief and framed the inquiry at a high level of generality. He ruled that because the Eighth Amendment does not permit state officials to deny effective treatment for the serious

medical needs of prisoners, the "[d]efendants had fair notice that denying effective treatment" for Campbell's gender dysphoria would violate the Constitution. The judge re-buffed the defendants' request for a more fact-specific analysis focusing on sex-reassignment surgery.

## II. Discussion

### A. Appellate Jurisdiction

The defendants appeal the denial of qualified immunity. "[P]retrial orders denying qualified immunity generally fall within the collateral order doctrine." *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014) (citation omitted). Campbell's suit seeks damages and injunctive relief, and the case will pro-ceed to trial on the claim for injunctive relief even if the defendants are entitled to qualified immunity on the damag-es claim. Campbell argues that we should therefore decline to exercise jurisdiction over this interlocutory appeal.

That position cannot be squared with Supreme Court and circuit precedent. It has long been clear that an order deny-ing qualified immunity, "to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Qualified immunity is a form of immunity from suit—that is, the trial process and attendant burdens—not merely immunity from damages. *Id.* at 526–27.

The Supreme Court has not had occasion to decide whether an order denying qualified immunity may be immediately appealed when the suit also seeks injunctive relief. *Id.* at 520 n.5. We have done so, however. In *Scott v. Lacy*, 811 F.2d 1153 (7th Cir. 1987), the plaintiff sought

money damages and injunctive relief in a suit against public
university officials. *Id.* at 1154. He argued that the collateral-
order doctrine is inapplicable to suits seeking injunctive
relief as well as damages because the case could still proceed
to trial regardless of the outcome of an interlocutory appeal
of a qualified-immunity ruling. *Id.* at 1153.

Acknowledging a circuit split on this question, we fol-
lowed the majority rule and held "that a pending request for
an injunction does not defeat jurisdiction of interlocutory
appeals based on claims of immunity." *Id.* We restated the
reasoning in *Forsyth* and added that "if a request for an
injunction prevented appeal on the question of immunity,
plaintiffs who wished to harass officials to travail would
need only demand equitable relief." *Id.* at 1154.

Every circuit to address this question agrees. *See Acierno
v. Cloutier*, 40 F.3d 597 (3d Cir. 1994) (en banc); *Schopler v.
Bliss*, 903 F.2d 1373 (11th Cir. 1990); *DiMartini v. Ferrin*,
889 F.2d 922 (9th Cir. 1989); *Giacalone v. Abrams*, 850 F.2d 79
(2d Cir. 1988); *DeVargas v. Mason & Hanger-Silas Mason Co.*,
844 F.2d 714 (10th Cir. 1988); *Drake v. Scott*, 812 F.2d 395 (8th
Cir. 1987); *Kennedy v. City of Cleveland*, 797 F.2d 297 (6th Cir.
1986); *de Abadia v. Izquierdo Mora*, 792 F.2d 1187 (1st Cir.
1986). The Fourth Circuit—the outlier when we decided
*Scott*—has since reversed course. *See Young v. Lynch*,
846 F.2d 960 (4th Cir. 1988).

As we've noted, the Supreme Court hasn't squarely re-
visited the question left open in *Forsyth*. But in *Behrens v.
Pelletier*, 516 U.S. 299 (1996), the Court came quite close to
embracing the rule we adopted in *Scott*. The plaintiff there
raised multiple claims, including *Bivens* claims against
which the defendant unsuccessfully sought qualified im-

munity. *Id.* at 302–03. The plaintiff argued that the defend-ant's interlocutory appeal was inappropriate because he would still "be required to endure discovery and trial on matters separate from the claims against which immunity was asserted." *Id.* at 311. The Court clarified that a qualified-immunity appeal "cannot be foreclosed by the mere addition of *other claims* to the suit." *Id.* at 312 (emphasis added). Then, venturing beyond the specific facts of the case, the Court expressed the same concern we identified in *Scott*: under the plaintiff's reasoning, "the qualified-immunity right not to be subjected to pretrial proceedings" or "to trial itself [would] be eliminated, so long as the complaint seeks *injunctive relief.*" *Id.* (emphasis added). *Behrens* represents a variation on *Scott*—the case concerned multiple substantive claims rather than multiple forms of relief—but the variation was so slight that the Court saw fit to cite *Scott* in support of its conclusion. *Id.* at 312 n.5.

Campbell urges us to reconsider *Scott*, a step that would revive a long-dormant circuit split and come close to contra-dicting *Behrens*. We need "compelling reasons" to overrule circuit precedent. *Russ v. Watts*, 414 F.3d 783, 788 (7th Cir. 2005). We may do so when "our position remains a minority one among other circuits, when the Supreme Court issues a decision on an analogous issue that compels us to reconsider our position, or when an intracircuit conflict exists." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009) (citations omitted). None of those conditions are satisfied here. And while Campbell claims that she "is not asking this [c]ourt to reconsider qualified-immunity jurisprudence writ large," each of her arguments does just that. She argues that *Scott* rests on misperceptions about the efficacy of qualified immunity as a shield against the burdens of litigation. She

cites recent scholarship criticizing qualified immunity and marshals policy arguments focused on judicial resources. And she draws our attention to separate opinions by some Supreme Court justices raising questions about the doctrine.

We have no authority to depart from the Supreme Court's qualified-immunity jurisprudence. And while some justices have questioned qualified immunity, those misgivings haven't stopped the Court from vigorously applying the doctrine. *See, e.g.*, *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018). Campbell's fallback argument asks us to carve out an exception to *Scott* for cases involving a substantial risk of harm. But in true emergencies, a plaintiff can seek preliminary injunctive relief. *See Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 681–83 (7th Cir. 2012). We proceed to the merits.

## B. Qualified Immunity

We review qualified-immunity questions independently. *Green v. Newport*, 868 F.3d 629, 632 (7th Cir. 2017).

The Eighth Amendment's protection against cruel and unusual punishment includes the right of prisoners to be free from "pain and suffering [that] no one suggests would serve any penological purpose." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). As applied in the context of prison medical care, "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983" for violation of the Eighth Amendment. *Id.* We evaluate deliberate-indifference claims by "first examining whether a plaintiff suffered from an objectively serious medical condition[] and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*,

836 F.3d 722, 728 (7th Cir. 2016) (en banc). The parties agree that gender dysphoria is a serious medical condition. *See Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997) (describing gender dysphoria as a "serious psychiatric disorder").

To prove deliberate indifference, "mere negligence is not enough. … [A] plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. The linchpin is a lack of professional judgment. "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)). A prison medical professional faces liability only if his course of treatment is "such a substantial departure from accepted professional judgment, practice, or standards[] as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 895 (quoting *Collignon*, 163 F.3d at 988).

Qualified immunity protects government officials from damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Clark v. Walker*, 865 F.3d 544, 549–50 (7th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). We evaluate "(1) whether the facts, taken in the light most favorable to the plaintiff[], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). The latter

inquiry is often dispositive and may be addressed first. *Pearson*, 555 U.S. at 236. We do so here.

To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589. The principle of fair notice pervades the doctrine. Qualified immunity applies unless the specific contours of the right "were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 572 U.S. at 778–79.

Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). As the Supreme Court recently reminded us, "[a] rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 138 S. Ct. at 590 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (second alteration in original)). Existing caselaw must "dictate the resolution of the parties' dispute," *Comsys, Inc. v. Pacetti*, 893 F.3d 468, 472 (7th Cir. 2018), so while "a case directly on point" isn't required, "precedent must have placed the … constitutional question beyond debate," *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quotation marks omitted); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018). Put slightly differently, a right is clearly established only if "every reasonable official would have understood that *what he is doing* violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)) (emphasis added).

The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide

fair notice because qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Kisela*, 138 S. Ct. at 1152 (quotation marks omitted).

Here the judge framed the qualified-immunity question in very broad terms, asking whether it was clearly established that "denying effective treatment" for Campbell's medical condition violates the Eighth Amendment. That formulation—which is basically a highly conceptualized version of the deliberate-indifference standard—is far too general. On appeal Campbell likewise frames the issue at too high a level of generality, arguing that the defendants violated clearly established law by failing to exercise individualized medical judgment and persisting in an ineffective course of treatment. These broad principles have support in our caselaw, but neither has been applied in a factual context specific enough to provide fair notice to the defendants that their conduct was unconstitutional.

Campbell relies on *Roe v. Elyea*, 631 F.3d 843 (7th Cir. 2011), and *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011), but neither case clearly establishes that the conduct at issue here was unconstitutional. In *Elyea*, Illinois inmates with hepatitis requested antiviral drugs but were denied medication because a prison policy barred that treatment for inmates with fewer than 18 months of incarceration remaining. 631 F.3d at 850. We explained that "inmate medical care decisions must be fact-based with respect to the particular inmate" rather than the product of categorical rules and that administrative considerations cannot trump "reasonable medical judgment." *Id.* at 859, 863 (emphasis omitted). Treatment protocols are permissible, but in "an individual case, … prison officials still must make a determination that

application of the protocols result[s] in adequate medical care." *Id.* at 860.

In *Fields* we considered a facial Eighth Amendment challenge to a Wisconsin statute that flatly prohibited DOC officials from providing sex-reassignment surgery *or hormone therapy* to inmates. 653 F.3d at 552–53. The district court held that the "defendants acted with deliberate indifference in that [they] knew of [plaintiffs'] serious medical need but refused to provide hormone therapy because of" the statute. *Id.* at 555. We affirmed, but we did not specifically address the issue of sex-reassignment surgery because the plaintiffs' request was limited to hormone therapy. *Id.* at 556.

Campbell argues that *Elyea* and *Fields* clearly establish a right to individualized medical judgment. But to accept that framing would contradict the Supreme Court's instruction to eschew broad generalities. When considering deliberate-indifference claims challenging the medical judgment of prison healthcare personnel, qualified-immunity analysis requires us to frame the legal question with reasonable specificity.

The proper inquiry is whether then-existing caselaw clearly established a constitutional right to gender-dysphoria treatment beyond hormone therapy. This framing is specific enough to ensure that "the unlawfulness of the officer's conduct … follow[s] immediately from the conclusion that [the rule] was firmly established." *Wesby*, 138 S. Ct. at 590 (quotation marks omitted) (second alteration in original). And in this fact-intensive area of constitutional law, a broad-er formulation would violate the Supreme Court's instruc-tion that the specific contours of the right must be "sufficiently definite that any reasonable official … would

have understood that he was violating it." *Plumhoff*, 572 U.S. at 779.

Neither *Elyea* nor *Fields* provides the required level of specificity. *Elyea* amounts to a general admonition that officials must exercise medical judgment rather than mechanically apply categorical rules. And *Fields* doesn't place "beyond debate" the proposition that medical professionals violate the Eighth Amendment when they provide hormone therapy but decide—after extensive deliberation and consultation with an outside expert—to deny sex-reassignment surgery. *White*, 137 S. Ct. at 551. In both cases prison officials refused to provide *any* treatment for serious diseases based solely on categorical rules. That simply didn't occur here. These DOC officials consulted an expert in the field and, facing a gray area of professional opinion, decided to deny the "last and … most considered step" of gender-dysphoria treatment.

No case in the *Federal Reporter* could have warned these DOC officials that their treatment choice was unconstitutional. When the defendants were making these decisions, only one federal appellate decision had addressed the merits of a deliberate-indifference claim involving sex-reassignment surgery: *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (en banc).[2] There the First Circuit concluded that

---

[2] In *De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013), the Fourth Circuit reversed a district-court order dismissing a gender-dysphoric inmate's Eighth Amendment challenge at screening under 28 U.S.C. § 1915A. Even setting aside that difference in procedural posture, *De'lonta* bears no resemblance to this case. Unlike the defendants here, in *De'lonta* the Virginia Department of Corrections officials "never allowed [the plaintiff] to be evaluated by a [gender-dysphoria] specialist in the first place." *Id.* at 526 n.4; *see also id.* at 523 (explaining that the plaintiff had "never

prison officials who provided hormone therapy and lifestyle accommodations but denied a request for surgery did not violate the Eighth Amendment.[3] *See id.* at 90, 96.

Campbell next argues that then-existing caselaw clearly established that prison officials cannot abandon medical judgment by "persist[ing] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). It's true that we've identified this species of deliberate-indifference claim. *See Petties*, 836 F.3d at 729–30. But we've never applied that general principle to facts resembling these. Campbell's lightly developed argument does not convince us that this right was "established not as a broad general proposition but in a particularized sense so that the contours of the right are clear to a reasonable official." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015) (quotation marks omitted).

We've previously noted that "[f]or purposes of qualified immunity, [the Eighth-Amendment] duty" to treat prison-

---

been evaluated by a [gender-dysphoria] specialist concerning her need for sex reassignment surgery"). *Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015), is similar. There the Ninth Circuit reversed an order dismissing a gender-dysphoric inmate's Eighth Amendment challenge at screening. Unlike the defendants here, in *Rosati* the defendants applied a blanket policy against sex-reassignment surgery and never allowed the plaintiff to be evaluated by a gender-dysphoria specialist. *Id.* at 1039–40.

[3] A divided panel of the Fifth Circuit recently announced agreement with *Kosilek*. *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019). The panel majority focused on the ongoing debate over the efficacy of sex-reassignment surgery *in general* and wasn't prepared to accept the World Professional Association of Transgender Health's *Standards* as authoritative. *Id.* at 221–24. We don't need to venture beyond the record and address that wider debate to decide this appeal.

ers' serious medical conditions "need not be litigated and then established disease by disease or injury by injury." *Estate of Clark*, 865 F.3d at 553. Campbell seizes on this aphorism and argues that by the same token, "rights need not be established treatment by treatment."

That argument overlooks the nature of this deliberate-indifference claim. In *Estate of Clark*, the prison official "chose to do nothing" in response to a known risk of substantial harm to the prisoner. *Id.* When prison officials utterly fail to provide care for a serious medical condition, the constitutional violation is obvious and qualified immunity offers little protection. *See Orlowski v. Milwaukee County*, 872 F.3d 417, 422 (7th Cir. 2017) (denying qualified immunity where, in the face of clear symptoms, officers "chose to do nothing").

To be sure, the constitutional concern in cases involving no treatment at all is not disease- or injury-specific. But prisons aren't obligated to provide every requested treatment once medical care begins. In a deliberate-indifference case challenging the medical judgment of prison healthcare professionals who actually diagnose and treat an inmate's medical condition (as opposed to ignoring it), we *necessarily* evaluate those discrete treatment decisions. And we defer to those decisions "unless no minimally competent professional would have" made them. *Sain*, 512 F.3d at 895 (quotation marks omitted). Deciding whether a particular treatment plan was a "substantial departure from accepted professional judgment, practice, or standards"—a necessary predicate to establish an Eighth Amendment violation—requires a close examination of professional standards and the specific choices made by care providers. *Id.* (quotation marks omit-

ted). Given the fact-specific nature of these claims, the notice aspect of qualified-immunity doctrine is crucial.

Campbell also relies on our recent decision in *Mitchell v. Kallas*, 895 F.3d 492 (7th Cir. 2018), another gender-dysphoria case involving a Wisconsin inmate, Osborne, and Dr. Kallas. In that case Dr. Kallas denied a prisoner's request for hormone therapy despite Osborne's unequivocal endorsement of the treatment. He cited a DOC policy requiring at least six remaining months of incarceration to initiate a hormone regimen. *Id.* at 497. The inmate raised deliberate-indifference claims based on a "fail[ure] to provide [recommended] care for a non-medical reason" and "inexplicable delays." *Id.* at 498.

Because prisons around the country applied varied evaluation periods for hormone-therapy eligibility, we held that "Dr. Kallas was not on notice that a 13-month evaluation would violate" the Eighth Amendment. *Id.* at 500. To the extent that the claim was based on the length of time it took to complete the assessment, we concluded that qualified immunity protected Dr. Kallas from damages liability.

But we rejected the immunity defense to the failure-to-treat claim. We framed the question as "whether a prison doctor would have known that it was unconstitutional *never* to provide" hormone therapy. *Id.* at 499. Interpreting the refusal to begin hormone therapy as a complete denial of care, we observed that "[p]rison officials have been on notice for years that leaving serious medical conditions, including gender dysphoria, untreated can amount to unconstitutional deliberate indifference." *Id.* Given our decision in *Fields*, "circuit precedent clearly established that a *total absence of*

*treatment* for the serious medical needs created by gender dysphoria is unconstitutional." *Id.* (emphasis added).

We hadn't decided *Mitchell* when DOC officials were making decisions about Campbell's care, so it has little relevance to the qualified-immunity analysis here. Moreover, *Mitchell* illustrates the difference between a complete denial of care and context-specific judgment calls. A plausible interpretation of the record in *Mitchell* was that the DOC offered the inmate no treatment whatsoever. As we've explained, our caselaw clearly establishes that regardless of the disease or injury at issue, utterly failing to treat a serious medical condition constitutes deliberate indifference. Campbell, by contrast, received extensive treatment in the form of hormone therapy, counseling, and various lifestyle accommodations.

Deciding whether to provide additional medical interventions—especially when the inmate's preferred course of treatment poses considerable challenges to prison administration—is not the same as deciding to provide no treatment at all. Denying a specific therapy in a particular case *might* amount to a constitutional violation, but qualified immunity applies absent reasonably specific notice to prison officials.

In short, when the defendants denied Campbell's request for sex-reassignment surgery, no case clearly established a right to gender-dysphoria treatment beyond hormone therapy. As for Campbell's requests for electrolysis and makeup, our cases offer no indication that denying arguably nonmedical cosmetic accommodations violates the Eighth Amendment.

Qualified-immunity analysis also asks whether "the facts, taken in the light most favorable to the plaintiff[], show that the defendants violated a constitutional right." *Gonzalez*, 578 F.3d at 540. Because no case clearly establishes that denying treatment beyond hormone therapy is unconstitutional, qualified immunity applies regardless. So it's enough to note that a factfinder may infer deliberate indifference only where a prison medical professional makes "a medical decision that has no support in the medical community" and provides "a suspect rationale … for making it." *Petties*, 836 F.3d at 729 n.2. And "even admitted medical malpractice does not automatically give rise to a constitutional violation"; only "sub-minimal competence … crosses the threshold into deliberate indifference." *Id.* at 729. Prison healthcare providers necessarily exercise medical judgment—and thus by definition do not act with deliberate indifference—when they base treatment decisions on accepted national standards and the advice of an expert.

### III. Conclusion

Because clearly established law did not require Wisconsin prison officials to provide Campbell with gender-dysphoria treatment beyond hormone therapy, the defendants are immune from damages liability. The district court's decision to the contrary is

REVERSED

WOOD, *Chief Judge*, dissenting. The Supreme Court has pounded home the point that when deciding whether qualified immunity applies, lower courts cannot view the law at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Nonetheless, while "a case directly on point" may be sufficient, it is not necessary. *White v. Pauly*, 137 S. Ct. 548, 551 (2017). The majority opinion in the case before us recognizes this distinction, admitting that "'[f]or purposes of qualified immunity, [the Eighth-Amendment] duty' to treat prisoners' serious medical conditions 'need not be litigated and then established disease by disease or injury by injury.'" *Ante* at 22 (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017)). The Eighth Amendment applies whether the serious condition is Type I diabetes, paraplegia, congestive heart failure, or a broken leg, even though the treatments for those conditions are quite different. Yet the majority fails to follow this rule. Instead, it states that Campbell must show a clearly established right specific to her condition—gender dysphoria—and to the particular way the medical profession addresses it. *Ante* at 20. With respect, that is the wrong question, and so it leads to the wrong answer. I therefore dissent.

Before outlining my disagreement with the majority, I should emphasize my agreement with much of what it says. I join in full Part II.A of the majority's opinion, which addresses our jurisdiction over this interlocutory appeal. Like my colleagues, I see no reason to break with our sister circuits, overrule *Scott v. Lacy*, 811 F.2d 1153 (7th Cir. 1987), and decline jurisdiction because of Campbell's outstanding request for injunctive relief. My disagreement is limited to the majority's application of the qualified immunity inquiry to this case. Even there, I have no quarrel with much of the reasoning. As the majority notes, the relevant Eighth Amendment inquiry is

whether Kallas and the other defendants were deliberately in-different to Campbell's serious medical condition. *Ante* at 16. As the majority recognizes, gender dysphoria is a serious medical condition for which prison officials must provide treatment. *Ante* at 17 (citing *Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997)). We diverge only on the description of the clearly established right and whether Campbell has presented enough evidence to show (if believed by a trier of fact) that Kallas violated that right.

## I

This case comes to us from the denial of qualified immun-ity by the district court. That means our review is limited. We must answer only two questions: whether defendants vio-lated a constitutional right, and whether that constitutional right was clearly established at the time defendants acted. *Ashcroft v. Iqbal*, 556 U.S. 662, 673 (2009). This means not only that we must take the facts in the light most favorable to the plaintiff, *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014), but also—as is the case any time there are disputed issues of material fact—that we have no jurisdiction to resolve any factual dis-putes. *Johnson v. Jones*, 515 U.S. 304, 313 (1995). We thus ap-proach the facts in much the same way as we would if we were reviewing a motion to dismiss or a grant of summary judgment. See, *e.g.*, *Tolan*, 572 U.S. at 657 (vacating the grant of qualified immunity because "[i]n holding that Cotton's ac-tions did not violate clearly established law, the Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to Tolan").

Some 22 years ago, this court stated that because prisoners were "entitled only to minimum care," they were not entitled

to sexual-reassignment surgery ("SRS")[1] or hormone therapy, because the minimal record before the court indicated that those treatments were expensive and "esoteric medical treatment that only the wealthy can afford …." *Maggert*, 131 F.3d at 671–72. But that was not our last word on this issue. In *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011), we evaluated a claim that the total denial of *either* medically necessary hormones *or* medically necessary SRS violated the Eighth Amendment. Unlike in *Maggert*, in *Fields* we had the benefit of a full trial record. *Id.* at 555. We determined that time and the crucible of trial had disproven the "empirical assumptions" on which *Maggert* relied. *Id.* Both hormones and SRS were, for example, significantly cheaper than other treatments and surgeries that the Wisconsin Department of Corrections had provided in recent years. *Id.*

Despite the majority's contention, *ante* at 20, while the bulk of our discussion in *Fields* focused on hormone therapy, we also specifically addressed the *Fields* plaintiffs' attempt to strike down Wisconsin's surgery ban. On this point, we upheld the district court's enjoining of Wisconsin's surgery ban, because that statute forbade "even the consideration of … surgery" regardless of whether SRS was medically necessary for

---

[1] I recognize that the term "sexual-reassignment surgery" is now considered an outdated and inaccurate descriptor of this procedure. This surgical treatment is now more commonly referred to as gender confirmation surgery. See, *e.g.*, *Gender Confirmation Surgery*, UNIVERSITY OF MICHIGAN SCHOOL OF MEDICINE, https://www.uofmhealth.org/conditions-treatments/gender-confirmation-surgery (last visited July 26, 2019) (explaining the available options for gender confirmation surgery in the University of Michigan Health System). For the sake of consistency, however, I use the term "SRS" here, as it is the label given to this surgery by the majority, the parties, and the WPATH Standards.

an individual prisoner. *Id.* at 558–59. We concluded that "[i]t is well established that the Constitution's ban on cruel and unusual punishment does not permit a state to deny effective treatment for the serious medical needs of prisoners. … Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture." *Id.* at 556. Our bottom line was simple: "Just as the legislature cannot outlaw all effective cancer treatments for prison inmates, it cannot outlaw the only effective treatment for a serious condition like [gender dysphoria]." *Id.* at 557.

Recently, in *Estate of Clark,* we recognized that "[t]he Supreme Court has long held that prisoners have an Eighth Amendment right to treatment for their 'serious medical needs,'" 865 F.3d at 553, and thus that this right is clearly established. "For purposes of qualified immunity, that legal duty need not be litigated and then established disease by disease or injury by injury." *Id.* The majority opinion now seems to walk back the latter statement. But in doing so it confuses the legal definition of the clearly established right with the factual question of the medical necessity of a particular treatment for a particular patient.

Our inquiry should be simple: first, we must determine whether Campbell suffers from a medical need that is clearly established as objectively serious; second, we must determine whether, as a subjective matter, it was clear *to the defendants* that they were being deliberately indifferent to Campbell's objectively serious medical need.

The first half of this inquiry is easy. We recognized in 1997 that "[g]ender dysphoria … is a serious psychiatric disorder." *Maggert,* 131 F.3d at 671. It has thus been established for more than 20 years that gender dysphoria is a serious medical need;

commendably, the defendants in this litigation do not contend that it is not. See also *Fields*, 653 F.3d at 554–55; *Meriwhether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987) (holding that "plaintiff's complaint [asserting that she received no treatment for her gender dysphoria] does state a 'serious medical need'").

That takes us to the second inquiry: whether the defendants were deliberately indifferent in refusing Campbell's requests for surgery. Because the deliberate indifference inquiry is a subjective one, it necessarily "turns on [a defendant's] mental state, and it is well established what the law requires in that regard." *Zaya v. Sood*, 836 F.3d 800, 807 (7th Cir. 2016). If a defendant "consciously disregard[s] the risks of [denying an inmate's medical care], then his conduct violates clearly established law under the Eighth Amendment." *Id.* at 807–08.

Proving someone's state of mind is always difficult. See *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*) ("Rarely if ever will an official declare, 'I knew this would probably harm you, and I did it anyway!'"). But it is not impossible: circumstantial evidence pointing to deliberate indifference can be gathered in medical cases just as in others. See *id.* The obvious case is a defendant who sees a suffering inmate and ostentatiously does nothing to help her. See, *e.g.*, *Mitchell v. Kallas*, 895 F.3d 492, 499 (7th Cir. 2018) ("Prison officials have been on notice for years that leaving serious medical conditions, including gender dysphoria, untreated can amount to unconstitutional deliberate indifference."). Nonetheless, that is the beginning, not the end, of the deliberate-indifference inquiry. See *Zaya*, 836 F.3d at 805 ("[W]e have also made clear that an inmate need not show that he was 'literally ignored' to prevail on a deliberate-indifference claim.").

A plaintiff may prove deliberate indifference through evidence that the defendant's treatment was far outside of medical norms. "[I]f the defendant's chosen 'course of treatment' departs radically from 'accepted professional practice,' a jury may infer from the treatment decision itself that no exercise of professional judgment actually occurred." *Id.* (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). Similarly, it has long "been established that the choice of an 'easier and less efficacious treatment' can demonstrate that the actor displayed 'deliberate indifference … rather than an exercise of professional judgment.'" *Roe v. Elyea*, 631 F.3d 843, 861 (7th Cir. 2011) (internal citation omitted) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 n.10 (1976)). Finally, "[a]nother situation that might establish a departure from minimally competent medical judgment is where a prison official persists in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 729–30.

Importantly, whether a defendant had a deliberately indifferent state of mind is not a legal question; it is a factual one. See *Zaya*, 836 F.3d at 808 ("As we've explained, that's [*i.e.* whether the defendant was deliberately indifferent] a question of fact that needs to be resolved by a jury."); *Petties*, 836 F.3d at 728 ("We must determine what kind of evidence is adequate *for a jury* to draw a reasonable inference that a prison official acted with deliberate indifference." (emphasis added)). We can thus resolve this case now only if there is no disputed issue of material fact on this point.

The question whether a particular course of treatment for an objectively serious medical condition amounts to deliberate indifference can be answered only with evidence from the medical community. For that reason, courts cannot look to outdated *factual* evidence from past cases to determine

whether some course of treatment is within acceptable boundaries. If the medical community uniformly decides that a recent advance is the only proper course of treatment, a defendant cannot rely on a case from before that advance occurred to say that her outdated treatment choice was reasonable. A court's role is only to determine whether a plaintiff has put forward sufficient evidence to allow a factfinder to conclude that the treatment she received was so far outside the bounds of medical professional judgment that it amounted to deliberate indifference.

## II

What, then, is the evidence about treatments for gender dysphoria? Is it undisputed that responsible doctors might choose the course that Wisconsin followed, or is there evidence that, if believed by a jury, would show that Wisconsin's choice was so far out of line with accepted practice that it amounted to deliberate indifference? We do not write here on a clean slate. In *Fields*, the district court "addressed both hormone therapy and sex reassignment surgery," and we upheld its finding that banning either treatment despite its medical necessity violated the Eighth Amendment. *Fields*, 653 F.3d at 558–59. While no other court of appeals has dealt with a prisoner's claim for SRS in the context of qualified immunity, our sister circuits are largely in accord about whether the denial of SRS can violate the Eighth Amendment: It can. See *Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (holding that the denial of SRS stated a claim under the Eighth Amendment); *De'lonta v. Johnson*, 708 F.3d 520, 525–26 (4th Cir. 2013) (same). The cases denying a plaintiff's claim for SRS do so not because the denial of SRS can never be deliberate indifference, but because the factual record before them did not contain evidence

that, if believed, would show that *only* SRS would be appropriate for that plaintiff. See *Lamb v. Norwood*, 899 F.3d 1159, 1162–63 (10th Cir. 2018). In *Lamb*, the court noted that the "sparseness of the summary judgment record precludes a reasonable fact-finder from inferring deliberate indifference." *Id.* It also relied on the fact that "Paul Corbier, M.D. stated under oath that Michelle's existing treatment has proven beneficial and that surgery is impractical and unnecessary in light of the availability and effectiveness of more conservative therapies." *Id. Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (*en banc*), is similar. There the First Circuit rejected Kosilek's plea for SRS, but it went out of its way to say that "this case presents unique circumstances; we are simply unconvinced that our decision on the record before us today will foreclose all litigants from successfully seeking SRS in the future. Certain facts in this particular record—including the medical providers' non-uniform opinions regarding the necessity of SRS, Kosilek's criminal history, and the feasibility of postoperative housing—were important factors impacting the decision." *Id.* at 91. It is also noteworthy that the First Circuit decided *Kosilek* only after a lengthy trial. *Id.* at 74–81 (describing the trial record); *Kosilek v. Spencer*, 889 F. Supp. 2d 190, 212 (D. Mass. 2012) (making findings of fact after "a 28-day trial").

The one court of appeals to foreclose SRS entirely said that it was doing so based on a lack of record evidence. See *Gibson v. Collier*, 920 F.3d 212, 220–21 (5th Cir. 2019). In *Gibson*, the Fifth Circuit held that Gibson could not survive summary judgment because she had provided *no* evidence that SRS was the only medically acceptable treatment option for her. *Id.* She "did not dispute that the medical controversy" over SRS—which the Fifth Circuit found existed based on *Kosilek*—"continues to this day." *Id.* at 221. Campbell, by contrast, has

produced precisely the evidence that the Fifth Circuit wanted. As the majority opinion notes, Campbell's experts have testified that SRS is both medically necessary for her and uncontroversial within the medical community. Indeed, Dr. Kathy Oriel opined that "'no physician with adequate expertise and experience in gender medicine would' dispute Campbell's need for sex-reassignment surgery." *Ante* at 11. If the trier of fact credited that testimony, Campbell could prevail.

The majority attempts to distinguish *De'lonta* because it was an appeal of a motion to dismiss under 28 U.S.C. § 1915A, and because the plaintiff there had not yet been evaluated by a gender-identity medical specialist. *Ante* at 21 n.2. But just as in a motion-to-dismiss posture, in a qualified immunity interlocutory appeal we must draw inferences and resolve factual disputes in the plaintiff's favor. And the fact that the defendants in *De'lonta* had not yet allowed De'lonta to see a specialist has no bearing on the legal question whether refusing to provide universally accepted surgery would violate the Eighth Amendment. As the Fourth Circuit recognized, a surgical consultation was merely one step toward curing the potential constitutional violation. See *De'lonta*, 708 F.3d at 526 & n.4.

The Ninth Circuit's decision in *Rosati*, which rests on a procedural and factual posture similar to that in *De'lonta*, is also instructive. There the court held that Rosati stated an Eighth Amendment claim despite prison officials having engaged a medical consultant, because the consultant was "a physician's assistant with no experience in transgender medicine." *Rosati*, 791 F.3d at 1040. While Cynthia Osborne, the defendants' outside consultant in our case, does specialize in gender identity issues, she is not a doctor. And Campbell has adduced significant evidence that Osborne's opinion about

the need for surgery is not only incorrect, it is also well outside the bounds accepted by the medical community. This presents a question of fact for a trial, where the trier of fact will decide whether to accept or reject Campbell's views.

As the district court recognized, when viewed in the light most favorable to Campbell, the evidence shows that despite being treated with hormones, Campbell's gender dysphoria has not improved. She has continued to threaten self-castration and to experience suicidal ideation. The defendants are aware of Campbell's continued suffering and have nevertheless refused her further treatment. Campbell's experts have opined that *no* reasonable medical professional would recommend any course of treatment in her case except surgery. The majority opinion swipes this evidence away. Instead it chooses to reach its own conclusion that, despite members of the medical community swearing to the contrary, SRS is not so well-established that Kallas could be deliberately indifferent by refusing to provide it. But that is a conclusion of fact that lies outside our competence. It also rests on the flawed legal basis of an "injury by injury" determination of clearly established law.

I respectfully dissent.