IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MARK A. CAMPBELL,
also known as NICOLE ROSE CAMPBELL,

                Plaintiff,

   v.                                                            OPINION and ORDER

KEVIN KALLAS, RYAN HOLZMACHER,
JAMES GREER, GARY ANKARLO, JEFF ANDERS,                16-cv-261-jdp
MARY MUSE, MARK WEISGERBER,
ROBERT HABLE, CATHY A. JESS, and
CINDY O'DONNELL,

                Defendants.

---

Plaintiff Nicole Rose Campbell, born Mark A. Campbell, now identifies as a woman. She is incarcerated at Racine Correctional Institution, a male prison, where she is serving a long sentence for a sex crime against a child. Campbell suffers from severe, unremitting gender dysphoria, which causes her severe anguish and puts her at risk of self-harm. She has received some treatment for gender dysphoria while incarcerated, including counselling and cross-gender hormone therapy. She filed this lawsuit so that she could complete her transition with sex reassignment surgery, which defendants have declined to provide. Campbell contends that in refusing to provide the surgery, Wisconsin Department of Corrections officials have violated her Eighth Amendment right to necessary medical care.

Campbell originally sought both damages and injunctive relief. But the court of appeals held that the defendant officials in this case are entitled to qualified immunity. *See Campbell v. Kallas*, 936 F.3d 536 (7th Cir. 2019). The court of appeals reasoned that any right that Campbell has to sex reassignment surgery is not yet clearly established because, at the time defendants denied Campbell the surgery, no prison in the United States had ever provided sex

reassignment surgery to an inmate. As a result, Campbell is not entitled to damages; her only available remedy is injunctive relief against the DOC.

Many of the material facts were established as undisputed at summary judgment. All agree that severe gender dysphoria is a serious medical need, that Campbell suffers from it, and that sex reassignment surgery can in some cases effectively treat it. But two facts were disputed: whether sex reassignment surgery was medically necessary for Campbell, and whether defendants were deliberately indifferent to Campbell's serious medical need in refusing to provide the surgery. Those questions were tried to the court over three days in March 2020.[1] This opinion sets out the court's findings of fact and conclusions of law as required under Federal Rule of Civil Procedure 52.

PRELIMINARY MATTERS

The court begins with final rulings on the parties' motions in limine.

**A. Campbell's motions in limine**

Campbell filed five motions in limine.

First, Campbell moved to limit the testimony of defendant Kevin Kallas, the DOC's director of mental health, on the treatment of gender dysphoria because he acknowledges that he is not an expert in that subject, and he did not disclose an expert report. Dkt. 122. I'll grant the motion, but at trial Kallas did not give opinions about what specific treatments are appropriate for gender dysphoria. I will admit and consider Kallas's testimony about how the

---

[1] Campbell has been ably represented in this litigation by pro bono counsel Ilana Vladimirova, Joseph Diedrich, Natalia Kruse, and Thomas Patrick Heneghan, of Husch Blackwell, LLP. The court thanks them for their work.

DOC provides treatment to transgender inmates and the problems that providing that treatment pose in a correctional facility.

Second, Campbell moved to limit evidence of her criminal history. Dkt. 123. I'll deny the motion. To be clear: an inmate's criminal history is irrelevant to whether she has a right to necessary medical treatment. Because the matter was tried to the court, Campbell faces no unfair prejudice from the discussion of her criminal history. Campbell is convicted of a sex crime against a child, which the DOC reasonably considered in evaluating Campbell's request for sex reassignment surgery because Campbell will be placed in the state's women's prison if she has the surgery. Criminal history is an appropriate consideration in determining prison placement. And Cynthia Osborne, the consultant engaged by the DOC to evaluate Campbell, considered Campbell's criminal history, but ultimately it did not affect Osborne's conclusions about the appropriateness of sex reassignment surgery.

Third, Campbell moved to limit defense witnesses from providing expert testimony not disclosed in a Rule 26(a) report. Dkt. 124. The court will grant the motion, and the ruling applies to both sides. At trial, the court allowed some witnesses to testify on topics not disclosed in expert reports, particularly Felicia Levine, one of Cambell's witnesses, and Cindy Osborne, a defense witness. But for purposes of its decision, the court will consider only testimony that was at least generally disclosed in the expert's report. The court will thus disregard Osborne's undisclosed testimony about autogynephilia, which Osborne offered in response to the court's question about any potential link between gender dysphoria and crime. That testimony was also speculative and ultimately irrelevant.

Fourth, Campbell moved to exclude certain opinions from the DOC's retained expert, Dr. Chester Schmidt, as unreliable. Dkt. 125, at 3–10. The DOC withdrew Schmidt as a witness, so the court will grant Campbell's motion as unopposed.

Fifth, Campbell moved to exclude the testimony of the DOC's security chief, Larry Fuchs. Dkt. 126. Defendants originally named Fuchs' predecessor, Mark Weisgerber, as their expert on prison security. They disclosed Fuchs less than two months before trial. Defendants' late disclosure of Fuchs was justified because Weisgerber retired after defendants made their original expert disclosures. The court denied Campbell's motion before trial, but it restricted Fuchs's testimony to what was disclosed in the Weisgerber report and allowed Campbell to use Weisgerber's deposition testimony for impeachment. (As it turned out, there was no significant conflict between the Weisgerber report and Fuchs's testimony.)

## B. Defendants' motions in limine

Defendants filed two motions in limine.

First, defendants sought to exclude deposition designations of certain individual defendants, members of the transgender committee, which Campbell had offered to show their lack of experience and knowledge of transgender issues. Defendants did not present any testimony from these individuals, and defendants contend that their lack of knowledge about transgender care is irrelevant. I'll grant the motion. Defendants concede that some members of the transgender committee are not well-informed about the treatment of gender dysphoria. The purpose of the committee is to evaluate requests for treatment for gender dysphoria and accommodations for transgender inmates. It includes members who provide psychological counseling and treatment to inmates as well as members responsible for prison security. Most of its members would disavow being experts in the treatment gender dysphoria, and the DOC

relies on expert consultants to address specific cases. So whether members of the committee are themselves well-informed about the treatment gender dysphoria is ultimately irrelevant to the issues before the court.

Second, defendants moved to exclude testimony about the medical necessity of breast augmentation, electrolysis, and voice therapy. Dkt. 120. Defendants are correct: neither of Campbell's experts offered opinions about the medical necessity of breast augmentation, electrolysis, and voice therapy in their reports. *See* Dkt. 63-1 (Levine report) and Dkt. 65-1 (Oriel report). At trial, Levine testified that these interventions can be necessary for some transgender women and are necessary for Campbell. But because this opinion was not disclosed in her report, the court will not consider that testimony. *See* Fed. R. Civ. P. 37(c)(1). As a result of this ruling, Campbell has no admissible evidence that these interventions are medically necessary for Campbell's gender dysphoria, so the court will deny Campbell's request that the DOC be ordered to provide them.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

A detailed factual background is in the court's summary judgment order, Dkt. 96, so a succinct summary is sufficient here. Campbell has been a prisoner in the custody of the DOC since 2008. She is currently housed at the Racine Correctional Institution (RCI). Her anticipated release date is in 2041. Campbell requested treatment for gender dysphoria, and she began hormone therapy in 2013. She responded well to hormone therapy, but her gender dysphoria still left her in anguish. She has requested sex reassignment surgery since 2013.

The DOC has a formal policy addressing treatment for gender dysphoria and for accommodating transgender inmates, Division of Adult Institutions Policy 500.70.27. The

policy calls for a transgender committee (known as the "gender dysphoria" committee in pre-2017 versions of the policy) to interpret and develop the DOC's gender dysphoria policy and to review inmate requests for specific services and treatments. Defendants are past or current members of the committee.

At trial, the court heard testimony from seven witnesses: Campbell herself; her two retained experts, Drs. Kathy Oriel and Felicia Levine; and the DOC's four non-retained experts, Cynthia Osborne (the DOC's gender dysphoria consultant), Dr. Betsy Luxford (the DOC physician who managed Campbell's hormone therapy), Dr. Kevin Kallas (the DOC's mental health director), and Larry Fuchs (the DOC's security chief).

**A. Uncontested issues**

The trial testimony confirmed key material facts that were established as undisputed at summary judgment and stipulated by the parties before trial.

Campbell suffers from severe and unremitting gender dysphoria.

Gender dysphoria is a serious medical condition that causes severe anguish and increases the risk of self-harm and suicide.

Sex reassignment surgery is not experimental or cosmetic. In the appropriate case, it is an effective treatment for gender dysphoria. Sex reassignment surgery is not a necessary treatment for all cases of gender dysphoria; some persons with gender dysphoria can be adequately treated without surgery.

**B. Contested issues**

The contested issues at trial were whether sex reassignment surgery was medically necessary for Campbell and whether defendants were deliberately indifferent in failing to provide it.

**1. Whether sex reassignment surgery is medically necessary for Campbell**

    **a. The WPATH Standards of Care**

The evidence of medical necessity in this case focused on Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, a document published by the World Professional Association for Transgender Health to provide clinical guidance to health professionals in the treatment of individuals with gender identity issues.[2] For the purposes of this case, the most important part of Standards of Care is the list of specific diagnostic criteria for various treatments for gender dysphoria, including sex reassignment surgery. The qualifying criteria for complete sex reassignment surgery are:

> 1. Persistent, well documented gender dysphoria;
>
> 2. Capacity to make a fully informed decision and to consent for treatment;
>
> 3. Age of majority in a given country;
>
> 4. If significant medical or mental health concerns are present, they must be well controlled;
>
> 5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).
>
> 6. 12 continuous months of living in a gender role that is congruent with their gender identity;

WPATH Standards of Care, at 60.

Defendants contended in their pre-trial brief that the WPATH Standards of Care did not reflect a consensus, but only one side of the medical debate over sex reassignment surgery.

---

[2] World Professional Association for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (7th version), *available at* https://www.wpath.org/publications/soc

Dkt. 138, at 2. But that wasn't borne out by the evidence at trial, and it contradicts the parties' pre-trial stipulation that:

> Among GD [gender dysphoria] specialists, the generally accepted standards of care for treating GD are contained in the World Professional Association for Transgender Health's Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (the "WPATH Standards of Care").

Dkt. 130, ¶ 27.

That's not to say WPATH itself and the WPATH Standards of Care document are entirely beyond controversy. Osborne testified that, in her opinion, the WPATH organization had moved from its original purpose of evaluating evidence about effective treatment for gender identity issues toward excessively zealous advocacy. And she thought it was simplistic and naïve for WPATH to take the position that the Standards of Care should apply fully to all transgendered persons without regard institutional context. But, disputes about the institutional mission of WPATH aside, Osborne endorsed the diagnostic and treatment criteria in the Standards of Care, and she used those criteria in her professional work. The DOC itself purports to follow the criteria in the WPATH Standards of Care in making treatment decisions for transgender inmates.

The court finds that the diagnostic and treatment criteria in the WPATH standards of care represent the consensus of qualified medical professionals regarding the appropriateness of various treatments for gender dysphoria, including sex reassignment surgery. The criteria are flexible clinical guidelines, to be applied and adapted by health professionals to the circumstances of the patient.

### b. Whether Campbell meets the WPATH criteria

Turning specifically to Campbell's case, there is no dispute about the first three WPATH criteria. Campbell's severe gender dysphoria is persistent and well-documented; she's capable of informed decision-making; and she's of age.

Campbell's experts, Oriel and Levine, testified consistent with their reports that Campbell meets the other WPATH criteria as well. The parties stipulated, and I agree, that both experts are qualified in the area of treatment of gender dysphoria. I find their testimony on this topic to be credible and well-supported. But neither Oriel nor Levine have experience in treating transgender persons in prison. This is one of the reasons that I find Osborne's testimony to be particularly important, even though she is not herself an expert on prison management. Osborne is trained as a social worker, and she is a certified sex therapist and sex therapy supervisor. The treatment of transgender persons became a focus of her work about 20 years ago. She has evaluated about two hundred incarcerated people for gender dysphoria, primarily for the Wisconsin DOC. The parties stipulated, and again I agree, that Osborne is qualified in the area of treatment of gender dysphoria.

To put Osborne's trial testimony in context, it's useful to review the sequence of her involvement in Campbell's case. Osborne first evaluated Campbell at Kallas's request in 2012. At the time, Osborne concluded that sex reassignment surgery was "wholly contraindicated" for several reasons. Dkt. 74. Campbell suffered from depression, and Osborne believed that Campbell had a poor understanding of what it would be like to live full-time as a woman in the community, which she would not be able to achieve within a correctional institution. Osborne suggested that Campbell would benefit from counselling and hormone therapy.

Campbell then received mental health treatment and she began hormone therapy. Luxford testified about Campbell's successful hormone therapy. But Luxford wasn't involved in any decisions about surgery, so her testimony is useful only as background.

Campbell specifically requested sex reassignment surgery in 2013. But the DOC declined to provide the surgery because, under DOC policy, she was unable to satisfy WPATH criteria number six, which is sometimes referred to as the "real-life experience." The DOC decision was not based on an individualized assessment Campbell; it was a matter of formal DOC policy:

> Due to the limitations inherent in being incarcerated, a real-life experience for the purpose of gender-reassignment therapy is not possible for inmates who reside within a correctional facility. However, treatment and accommodations may be provided to lessen gender dysphoria.

DAI [Division of Adult Institutions] Policy No. 500-70-27 (Dkt. 75-9).

Campbell continued to press her request for sex reassignment surgery. In 2014, Kallas asked Osborne to evaluate Campbell again, this time to specifically evaluate Campbell for sex reassignment surgery. Osborne interviewed Campbell in May and issued a thorough report in August. Dkt. 75-10. Osborne's 2014 report, read as a whole, endorses Campbell as a good candidate for sex reassignment surgery. But Osborne identified what she described as two "potential contraindications."

One of these potential contraindications was that Campbell had not yet achieved the maximum benefit from hormone therapy, which had somewhat alleviated Campbell's gender dysphoria distress. So Osborne recommended that Campbell's hormone therapy be optimized before taking the irreversible step of surgery. But Osborne also acknowledged that long-term hormone therapy carried its own health risks, and she predicted that hormone therapy would

not be sufficient to relieve Campbell's severe gender dysphoria. Osborne predicted that her gender dysphoria would not remit without sex reassignment surgery. The parties have stipulated that Campbell's hormone levels were optimized in 2014. So when Campbell filed this suit in 2016, that potential contraindication had been eliminated for about two years, and by trial, it had been eliminated for six years.

The second potential contraindication was that Campbell would not be able to achieve a real-life experience while incarcerated in a male prison, at least not as the real-life experience had been conceived by community-based practitioners and patients. But Osborne's report included a long, thoughtful discussion of the real-life experience, in which Osborne expressed doubt that a traditional real-life experience was necessary or helpful in the case of incarcerated persons. Osborne identified the absence of the real-life experience only as a "potential" contraindication for Campbell, in contrast to the clear contraindications that she had identified in 2012.

Osborne had no further contact or involvement in Campbell's treatment after the 2014 report, and that report included a complete statement of her analysis of Campbell's case. But her trial testimony clarified and explained three important points.

The first important explanation concerned the severity and nature of Campbell's gender dysphoria. Osborne explained that Campbell has the most severe form of gender dysphoria, anatomic gender dysphoria, which means that the presence of male genitalia on her body causes particularly severe anguish. Non-anatomic gender dysphoria can sometimes be treated without surgery. But without sex reassignment surgery, Campbell's anatomic gender dysphoria will cause continuing severe mental anguish and she is at a substantial risk of self-mutilation or suicide.

11

The second important explanation concerns why Osborne did not expressly recommend sex reassignment surgery for Campbell. Osborne explained at trial that she had never in her career made an explicit recommendation for sex reassignment surgery—for any patient, whether in the community or in an institution. Her task was simply to identify contraindications and potential contraindications, leaving the decision to the patient. Osborne testified that, among the eight to ten incarcerated persons that she had evaluated specifically for suitability for sex reassignment surgery, she had found three whom she thought were good candidates for surgery. Campbell was one of those three.

The third important explanation concerned the purpose of the real-life experience and the need for that requirement among incarcerated persons. Osborne testified that the real-life experience was a common-sense practice based more on tradition than any science. She was aware of no systematic evidence that completion of a real-life experience led to better outcomes. Nevertheless, Osborne believed that a real-life experience was an important part of the treatment process for the majority of patients. But she acknowledged that departures from the requirement of the real-life experience might be appropriate in an individual case, particularly among incarcerated persons. Osborne had written a scholarly article in which she contended that an incarcerated transgender woman could indeed live in a gender role typical of a woman within the confines of a male prison, by embracing female-typical gender roles to the extent possible. Dkt. 88-10 (Cynthia S. Osborne & Anne A. Lawrence, *Male Prison Inmates With Gender Dysphoria: When Is Sex Reassignment Surgery Appropriate?* 45 Archives of Sexual Behavior 1649, 1656 (2016)). In the same article, Osborne questioned whether the real-life experience requirement "has much practical or prognostic relevance for inmates" particularly for inmates who, like Campbell, have many years of incarceration left to serve. *Id*.

12

Osborne testified that the purpose of the real-life experience was to ensure the patient's commitment to the gender transition and to confirm that the patient could adjust to life in the new gender role without aggravating psychological problems such as depression or creating new ones. Osborne expressed concern that sometimes incarceration itself might trigger gender confusion, and sex reassignment surgery would be inappropriate as a response to what might be a temporary condition. Osborne's testimony, and her 2014 report, make clear that she had none of these concerns in Campbell's case. Campbell's psychological conditions were well managed. Her gender dysphoria had an early onset, well before incarceration. And she has demonstrated resolute commitment to gender transition, having lived, to the fullest extent possible, as a woman in male prisons for years.

I find that Campbell suffers from severe unremitting anatomical gender dysphoria. Her gender dysphoria is a serious medical need, for which sex reassignment surgery is the only effective treatment.

### 2. Deliberate indifference

The second contested issue at trial was whether defendants have been "deliberately indifferent," that is, whether they have consciously disregarded Campbell's serious medical need for effective treatment for her gender dysphoria.

There is no question that defendants were aware that Campbell suffered from gender dysphoria: she had persistently requested treatment for it, and Kallas had commissioned two reports from Osborne asking her to evaluate Campbell's gender dysphora. The 2014 report was requested specifically to evaluate Campbell's suitability for sex reassignment surgery.

Osborne's 2014 report identified Campbell as a good candidate for sex reassignment surgery and concluded that the symptoms of gender dysphoria would not remit without

13

surgery. The reason defendants denied Campbell's request is clear: DOC policy flatly prohibited sex reassignment surgery for inmates. The policy cited the inability to achieve a real-life experience in prison as the basis for the rule. But this determination was not based on any assessment of Campbell's needs. The DOC had implemented by policy the same blanket rule against sex reassignment surgery that was held to be unconstitutional as enacted as a state statute. *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011).

At trial, Kallas testified that it would be irresponsible to disregard the fact that, post-surgery, a female transgender inmate would be transferred to Taycheedah, the state's female prison. And, thus, as a psychiatric professional, he had to consider whether a transgender inmate would be able to adapt to a female prison, which differed from male prisons.[3] Kallas expressed concern that if Campbell didn't adjust to life at Taycheedah, she might wish to return to her current institution. But once Campbell has sex reassignment surgery, there will be no going back. These are reasonable considerations, although I am not persuaded that this is what motivated the decision to deny sex reassignment surgery to Campbell. Osborne made clear in her report that she entertained no uncertainty about Campbell's diagnosis or Campbell's commitment to the transition. Kallas himself is not an expert in the treatment of gender dysphoria, and he did not at any time provide treatment to Campbell.

The transgender committee did not deny sex reassignment surgery to Campbell because anyone determined that she would not be able to adapt to life in Taycheedah. No professional

---

[3] The differences reflected unsurprising stereotypes: inmates at female prisons were more emotional and formed more complex social and intimate relationships; inmates in male prisons were more physical. Inmates in female prisons included many mothers, who tend to be hostile to those who have committed crimes against children. But Kallas acknowledged that those who have committed crimes against children face hostility in male prisons, too.

with expertise in the treatment of gender dysphoria had ever determined that Campbell would not be able to adapt to a female prison, that she was likely to regret the transition, or that she was otherwise not an appropriate candidate for sex reassignment surgery. The committee simply applied the policy.

The institutional decision was an understandable one, in 2014, because prisons in the United States did not provide sex reassignment surgery to transgender inmates. But the historical context does not change the facts established in this case: Campbell suffered from a serious medical need, of which prison officials were well aware, and those officials denied her the treatment known to be effective. To be clear, an inmate is not entitled under the Eighth Amendment to demand her chosen treatment if other effective treatment is provided. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Defendants had provided Campbell some ameliorating treatment in the form of hormone therapy, counselling, and a few lifestyle accommodations. But the consultant engaged by the DOC to evaluate Campbell for surgery made clear that the ameliorating treatment was not sufficient to alleviate Campbell's gender dysphoria. And at trial, defendants did not dispute that without surgery, Campbell was left in continuing anguish that surgery could alleviate.

At trial, Kallas and Fuchs, the security director, testified about the practical challenges posed by providing Campbell with sex reassignment surgery. Kallas and Fuchs identified no practical challenge that was any greater than housing a transgender woman in a male prison. Nor did defendants contend that providing the surgery would be impractical or unreasonably expensive. Campbell's evidence, which defendants did not dispute, was that the cost of the surgery was about $20,000, far less than treatment for other serious medical conditions that the DOC routinely provides.

I find that defendants consciously disregarded Campbell's need for treatment for her severe anatomic gender dysphoria by denying her the one effective treatment. They did so as a matter of DOC policy without an individualized assessment of her suitability for sex reassignment surgery. I find further that no reasonable professional with expertise in the treatment of gender dysphoria would conclude that Campbell was not an appropriate candidate for sex reassignment surgery.

Persons in criminal custody are entirely dependent on the state for their medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). For that reason, prison officials have a constitutional duty to provide inmates with the care they require for their serious medical needs. "If prison medical staff exhibit deliberate indifference to an inmate's serious medical condition, they subject her to unnecessary and wanton pain and suffering and thereby run afoul of the Eighth Amendment." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018).

I conclude, based on the record of the case as a whole and the facts that I have found at trial, that defendants were deliberately indifferent to Campbell's need for treatment for a serious medical need, and thus defendants violated Campbell's rights under the Eighth Amendment.

REMEDY

The final issue is the remedy. Campbell is not entitled to damages as a result of the court of appeals' decision that defendants are entitled to qualified immunity. Under the Prison Litigation Reform Act, any injunction "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A). The usual requirements apply. Campbell is entitled to an injunction if she has suffered

irreparable injury; monetary damages are inadequate; an injunction is warranted in light of the balance of hardships; and the public interest would not be disserved. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).

The first two elements are met because Campbell continues to suffer from gender dysphoria, which causes her anguish and puts her at risk of self-harm or suicide. Monetary damages, even if they were available, would not alleviate her suffering. At trial, Kallas testified that he was working on a new DOC policy that would allow Wisconsin inmates to receive sex reassignment surgery under certain conditions. But, regardless of Kallas's recent efforts, DOC policy has not yet changed, and it is not clear whether it will. I find that, without an injunction, Campbell will endure additional suffering, even if the DOC ultimately revises its transgender policy.

The third element is also met. Defendant's have identified no practical impediment to providing sex reassignment surgery to Campbell. The surgery is no more expensive or difficult than other treatment that the DOC routinely provides.

The fourth element is also met. The rights of transgender persons and sex reassignment surgery remain politically controversial, even outside the prison context. And some members of the public are outraged at any effort to improve the health and well being of inmates. But the true public interest lies in alleviating needless suffering by those who are dependent on the government for their care. That interest is served by an injunction requiring the Wisconsin DOC to promptly arrange for Campbell to be assessed by a qualified surgeon for sex reassignment surgery, and to provide that surgery if the surgeon deems her to be a suitable candidate.

At the beginning of trial, defendants requested that, if the court were to order sex reassignment surgery for Campbell, the court require Campbell to complete a real-life experience by serving a year at Taycheedah before surgery. That request came as a surprise, because previously the DOC designated any inmate with a penis to a male prison, regardless of gender identity or expression. I decline to impose any further prerequisites on Campbell's sex reassignment surgery; she has waited long enough.

As a practical matter, though, Campbell's waiting is not likely over. The evidence at trial was that there is only one qualified surgeon in Wisconsin, and that it would take a year or more for Campbell to actually get the surgery. In the meantime, although I won't require it as a prerequisite, the DOC may designate Campbell to Taycheedah to give her the opportunity to adjust to life in a women's prison. Based on the trial evidence, I am not persuaded that sex offender treatment is necessary prerequisite for the surgery or placement at Taycheedah. But the programming needs of inmates, and their designation to particular institutions, is not a matter that this court will typically second-guess. Accordingly, the DOC may also require Campbell to undergo sex offender treatment while she waits for surgery, so long as that treatment does not delay Campbell's assessment for sex reassignment surgery or the surgery itself.

The court will issue a separate order for injunction, in accordance with Seventh Circuit law. *MillerCoors LLC v. Anheuser-Busch Cos., LLC*, 940 F.3d 922–23 (7th Cir. 2019). Neither side has proposed specific language that should be included in the injunction, so the court will give the parties an opportunity to do so now, before the court issues the injunction. The court strongly encourages the parties to consult with each other and submit a joint proposal. If they cannot agree, they may submit separate proposed injunctions, along with a brief explanation

of why their proposal is consistent with Federal Rule of Civil Procedure 65, § 3626, and this decision.

## ORDER

1. Plaintiff Nicole Rose Campbell's motions in limine, Dkts. 122–126, are GRANTED in part and DENIED in part, consistent with the discussion above.

2. Defendants' motions in limine, Dkt. 120, are GRANTED.

3. The court finds that defendants violated Campbell's Eighth Amendment rights by denying her sex reassignment surgery. The court will set forth the injunction in a separate order, after hearing from the parties. They may have until December 22, 2020, to submit a proposed injunction.

4. Campbell's requests for breast augmentation, voice therapy, and electrolysis are DENIED.

Entered December 8, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge